Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/01/2017 09:11 AM CDT

Jeffry L. Strohmyer, M.D., appellant and
cross-appellee, v. Papillion Family Medicine, P.C.,
a Nebraska professional corporation, et al.,
appellees and cross-appellants.

___ N.W.2d ___

Filed June 9, 2017.    No. S-16-381.

1. **Equity: Appeal and Error.** In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

2. **Fraud: Judgments.** The existence of a fiduciary duty and the scope of that duty are questions of law for a court to decide.

3. **Corporations.** An officer or a director of a corporation occupies a fiduciary relation toward the corporation, and must comply with the applicable fiduciary duties in his or her dealings with the corporation and its shareholders.

4. **Corporations: Liability: Damages.** A violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach.

5. **Corporations.** An officer or a director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and should refrain from all acts inconsistent with his or her corporate duties.

6. **Partnerships.** Partners must exercise the utmost good faith in all their dealings with the members of the firm and must always act for the common benefit of all.

Appeal from the District Court for Sarpy County: William B. Zastera, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Russell S. Daub, and W. Eric Wood, of Downing, Alexander & Wood, for appellant.

Larry R. Forman, of Hillman, Forman, Childers & McCormack, for appellees.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Heavican, C.J.

## I. INTRODUCTION

Dr. Jeffry L. Strohmyer, Dr. Robert G. Naegele, and Dr. Edward M. Mantler formed Papillion Family Medicine, P.C. (PFM), located in Papillion, Nebraska. On December 31, 2013, Strohmyer provided notice that he was leaving PFM to start his own medical practice, effective March 31, 2014.

Strohmyer filed suit against PFM, Naegele, and Mantler due to PFM's failure to "buy out" Strohmyer and pay associated director fees following his departure. Strohmyer also contests PFM's calculation of the value of its stock, assets, and goodwill. PFM, Naegele, and Mantler counterclaimed.

The district court found that PFM was not a corporation under the laws of Nebraska. It further (1) held that the value of Strohmyer's stock was $104,220, (2) awarded Strohmyer $9,389.27 in unpaid compensation, and (3) awarded PFM damages in the amount of $30,673 on its cross-complaint. Strohmyer appeals. We affirm in part, and in part reverse and remand for further proceedings not inconsistent with this opinion.

## II. BACKGROUND

### 1. Factual History

#### (a) Formation of PFM

In 2000, Strohmyer, Naegele, and Mantler incorporated PFM, a Nebraska professional corporation conducting a medical and surgical practice, with its principal place of business in Papillion.

The articles of incorporation were filed on September 15, 2000. The three doctors were listed as the sole directors and shareholders of PFM. Naegele was elected to serve as president, Strohmeyer as vice president, and Mantler as secretary and treasurer. A document entitled "By-Laws of the Papillion Family Medicine, P.C. As of October 16, 2000" contains a "Buy Out" section outlining payment due to a doctor after death or departure, but it was not signed by any of the doctors. Naegele testified that he drafted this document and viewed it only as a draft for discussion at a directors' meeting.

A second document, entitled "Bylaws of Papillion Family Medicine, P.C.," was signed only by Mantler in his role as secretary of PFM. With his signature, Mantler certified that the bylaws were adopted by the board of directors on December 4, 2000. The bylaws stated that "the majority of the shares represented at the meeting and entitled to vote on the subject matter shall be the act of the shareholders, unless the vote of a greater number is required by law." These bylaws did not include any process for a director's departure from PFM, as a "buy out" or otherwise.

A third document, entitled "By-Laws of the Papillion Family Medicine, P.C. As of October 16, 2000," is identical to the first bylaws, but was signed by Mantler on April 2, 2012. With his signature, Mantler certified that the bylaws were adopted by the board of directors on October 16, 2000.

(b) Relevant Portions of
Articles of Incorporation
and Bylaws

The relevant portion of the October 16, 2000, bylaws states the following under the "Buy Out" section:

Upon death or departure the doctor or his estate will be paid every two weeks at the usual time, a pay check, which is the actual accounts receivable that are collected, less 1/3 expenses of the corporation. These payments

will continue for 6 months regardless of the remaining accounts receivable. . . .

. . . .

. . . For 2nd 6 months of the year after leaving, the doctor or his estate is paid 1/3 of the total assets at the time of departure, d[i]vided by 1/3, pai[d] in equal amounts over 6 months.

The October 16, 2000, bylaws also describe physician compensation:

1. The basis for physician compensation shall be calculated on the amount collected from a set of physician charges, not on the amount billed.

a. To this amount collected, one third of the common charges collected will be added. The common charges are all bills submitted by the physician assistants and all lab and x-ray charges.

b. From the collections shall be subtracted one third of the common expenses, including but not limited to common expenses, equipment, and supplies.

c. Also subtracted will be any expenses peculiar to the physician himself . . . .

d. Once the final amount is reconciled for a given pay period, the physician will draw money equal to 90% of an average of the . . . amount of money collect[ed] in the last 4 pay periods (a period of roughly 2 months).

As relevant, article V of PFM's articles of incorporation provides:

A director of the corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for any action taken, or any failure to take action as a director except for liability (i) for the amount of financial benefit received by a director to which he or she is not entitled; (ii) for intentional infliction of harm on the corporation or its shareholders; (iii) for a violation of Neb. Rev. Stat. §21-2096; and (iv) for an intentional violation of criminal law.

And article X provides in part:

> Any shareholder who ceases to be eligible to be a shareholder as herein provided shall be obligated forthwith to dispose of all of his shares to the Corporation or to some other person qualified to be a shareholder, all on such terms and conditions as the shareholders and the Board of Directors shall determine.

### (c) Agreement to Work
### 4 Days Per Week

Naegele and Mantler claim that in forming the corporation, they had a verbal agreement to each work 4 days per week at PFM, but that this agreement was never recorded in writing. Naegele testified that prior to this lawsuit, he never provided Strohmyer anything in writing that stated Strohmyer had to work 4 days per week. In addition, the directors did not sign a noncompete document or any other document that might establish liability to each other or to PFM for starting another practice.

Strohmyer testified that prior to and following the formation of PFM, he worked as an associate medical director for Uninet Healthcare Network. From 2001 to 2007, Strohmyer served in various medical staff leadership positions for Alegent Health (Alegent). In 2008, Strohmyer began working as the "Campus Medical Director and Quality Officer" at Alegent, requiring him to work 1½ days per week.

In 2009, Strohmyer became "Medical Director" at Alegent, which required that Strohmyer work "two full days" per week. Throughout that time, Strohmyer also worked as a hospitalist at Alegent. This limited his time at the clinic to 3 days per week. Naegele testified that prior to this lawsuit, he never provided Strohmyer anything in writing that said that he objected to Strohmyer's involvement with Alegent or the outside work Strohmyer was doing.

### (d) Nebraska Wage Payment and Collection Act

In his prayer for relief, Strohmyer sought his wages and attorney fees pursuant to the Nebraska Wage Payment and Collection Act (the Act).[1]

Section 48-1229 states in relevant part:

(1) Employee means any individual permitted to work by an employer pursuant to an employment relationship or who has contracted to sell the goods or services of an employer and to be compensated by commission. Services performed by an individual for an employer shall be deemed to be employment, unless it is shown that (a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his or her contract of service and in fact . . . and (c) such individual is customarily engaged in an independently established trade, occupation, profession, or business. . . .

. . . .

(6) Wages means compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis.

Section § 48-1231 states in relevant part:

(1) An employee having a claim for wages which are not paid within thirty days of the regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court. If an employee establishes a claim and secures judgment on the claim, such employee shall be entitled to recover (a) the full amount of the judgment and all costs of such suit and (b) if such employee has employed an attorney in the case, an

---

[1] See Neb. Rev. Stat. § 48-1228 et seq. (Reissue 2010 & Cum. Supp. 2016).

amount for attorney's fees assessed by the court, which fees shall not be less than twenty-five percent of the unpaid wages.

### (e) Medicaid Patients

A portion of Strohmyer's practice was devoted to Medicaid patients. In an April 18, 2005, memorandum from Naegele to all clinic staff, Naegele stated that "Mantler's patient list is now closed to all Medicaid patients" and that "Strohmyer and . . . Naegele will continue for the moment to see current Medicaid patients, and will evaluate new Medicaid patients on a case-by-case basis." The directors' meeting minutes for January 27, 2006, state that all three doctors were in attendance and discussed that "Naegele chooses to leave Medicaid" and that "Strohmyer and PA Gilroy will continue to serve Medicaid population. Much of this will be in . . . Strohmyer's nursing home rounds. No other providers at PFM will see Medicaid patients." However, Naegele testified that in 2006, he verbally instructed Strohmyer and Mantler to close their practice to Medicaid patients. Strohmyer testified that he was never told that he could not take Medicaid patients.

### (f) Strohmyer's Departure
### From PFM

In late 2012 or early 2013, Strohmyer stopped talking to Naegele and Mantler. On April 19, 2013, Strohmyer sent Naegele a letter requesting that the directors "define exit strategies" for PFM. He requested that the directors have the "office attorney formalize these documents over the next few weeks." On April 24, Naegele sent Strohmyer a letter referencing the bylaws and explaining the "Buy Out" provisions set forth in the bylaws of October 16, 2000.

On December 31, 2013, Strohmyer gave Naegele and Mantler notice that he was leaving PFM, effective March 31, 2014, to open his own medical practice. Naegele responded in his position as president of PFM, and stated that PFM agreed

to "follow the 'Buy Out' provisions of the bylaws of October 16, 2000, upon which we three members agreed." That same day, Naegele transferred a check in the amount of $90,000 from the PFM account for deposit to a trust fund. Naegele testified that he "estimated to buy a doctor out would be about $30,000" and that Naegele and Mantle would each receive $30,000 when they retired. It was listed in PFM's tax returns as a "Buy-Out Escrow." That money was later refunded in its entirety to PFM. On March 4, 2014, PFM distributed $30,000 to Naegele and $30,000 to Mantler.

Following Strohmyer's notice of departure from PFM, Naegele updated the office with new paint, carpet, and an x-ray machine. Strohmyer claims he did not know about any of these costs incurred, nor did he provide his approval for the purchases. Naegele claims that the office was overdue for these updates and that he thought the improvements were necessary to attract a new doctor to the practice.

On March 7, 2014, Strohmyer's attorney sent a letter to Naegele, stating that

> use of practice cash to pay for practice and leasehold remodeling constitutes misappropriation and breach of the By-laws with respect to the amounts of compensation received from prior earnings to be paid to the physicians.
>
> Any cash on hand now in the practice accounts (held for emergencies or high deductible situations) or for available cash is to be paid to . . . Strohmyer forthwith. . . . If you have plans to use . . . Strohmyer's share of the cash for any other purpose, please advise . . . Strohmyer immediately with an explanation and amounts planned to be used.

On April 11, 2014, pursuant to the October 16, 2000, bylaws' "Buy Out" provision, Naegele sent a letter to Strohmyer's attorney, stating that based on his calculations, the expenses were greater than the income between March 31 and April 11, 2014, and that "[b]ecause the bylaws prohibit charging a

former partner or his estate in the case of a negative balance, the net sum for a check today is zero dollars." He further stated that he "anticipated this outcome for ongoing payments." In a letter dated April 25, 2014, Naegele stated that for the period of April 14 to April 25, the expenses again exceeded the income, and that the net sum for a check to Strohmyer was zero.

## 2. Procedural History

On April 28, 2014, Strohmyer filed suit against PFM, Naegele, and Mantler. His operative complaint, filed October 14, alleges that defendants—PFM, Naegele, and Mantler— (1) breached the October 16, 2000, bylaws by failing to pay the wages due Strohmyer, by concealing $90,000, by refusing Strohmyer access to the financial records of PFM, and by using income and assets that would have otherwise been disbursed to Strohmyer to purchase capital assets and make capital improvements; (2) acted in violation of Neb. Rev. Stat. §§ 21-2212 and 21-2213 (Reissue 2012), which constituted grounds for judicial dissolution of PFM due to defendants' repudiation of the bylaws and failure to redeem Strohmyer's shares and due to the deadlock and oppressive conduct, all of which violate the articles of incorporation; (3) refused to pay Strohmyer wages, compensation, and/or director fees prior to and/or after his departure from PFM, in violation of the Act; (4) breached a fiduciary duty due to defendants' claim that the expenses of PFM have exceeded and will continue to exceed the total fees collected by PFM, and due to defendants' capital upgrades without notice to or approval of Strohmyer that have diverted funds that would have otherwise been paid to Strohmyer; and (5) failed to pay sums due to Strohmyer, thus requiring declaratory and injunctive relief, because compensation should have been paid to Strohmyer either as director fees or as postdeparture compensation and/or asset value under PFM's bylaws.

PFM, Naegele, and Mantler filed an answer and counterclaim to the first amended complaint. In the counterclaim,

they argued that (1) Strohmyer failed to engage in directors' activities and attend directors' meetings, and thus should not receive compensation for services as a director of PFM; (2) the services Strohmyer performed for Alegent and Uninet Healthcare Network during his time at PFM were performed "in violation of Strohmyer's duty to expend his best full-time professional efforts through PFM for the mutual benefit of the Physicians"; (3) following an agreement among the PFM physicians to refrain from accepting Medicaid patients, Strohmyer continued to provide medical services to Medicaid patients; and (4) while the physicians agreed to spend 4 days per workweek attending to patients of PFM, Strohmyer spent only 3 days per week attending to such patients. Accordingly, they argued that Strohmyer was unjustly enriched.

In Strohmyer's reply to defendants' answer and his answer to defendants' counterclaim, he alleged as an affirmative defense that (1) defendants in recent years called no directors' meetings and, in the alternative, distribution of director fees was not conditioned on attendance at directors' meetings; (2) Strohmyer's work for Alegent and Uninet Healthcare Network was "known, acquiesced to, and agreed to" by defendants and not in violation of the articles of incorporation; (3) the Act prevents defendants from reducing or delaying payment of compensation owed to Strohmyer; (4) the recovery of director fees paid to Strohmyer prior to 2010 are barred by the statute of limitations; (5) the causes of action and damages asserted by defendants for the recovery of income earned by Strohmyer as a result of his outside employment by Alegent or Uninet Healthcare Network prior to 2010 are barred by the statute of limitations; and (6) the causes of action and damages asserted by defendants are barred by the doctrine of laches, the doctrine of estoppel, and the statute of frauds.

The district court issued an order stating that PFM "does not meet the requirements of a professional corporation as dictated in the Nebraska Professional Corporation Act," because (1) the articles of incorporation do not comply with the Nebraska

Professional Corporation Act,[2] (2) there are no minutes indicating that PFM's alleged bylaws were adopted, and (3) the alleged bylaws from October 16, 2000, were not signed.

The court further held that the buyout clause was so ambiguous as to be unenforceable under Nebraska law. The court found that PFM was a business corporation and not a professional corporation, and that there was insufficient evidence to judicially dissolve the corporation. Accordingly, the court found it necessary to "stay the proceedings or any further order by this Court until the parties comply with Neb. Rev. Stat. § 21-20,166."

On May 22, 2015, Strohmyer subsequently filed a motion to exclude ex parte communications and for clarification of the earlier order. Following a hearing on that motion, the district court ordered:

> a. The Defendant corporation is given until July 13, 2015, to elect whether to purchase the common stock of [Strohmyer]. If it does, [Strohmyer's] counsel is to forthwith notify the Court at which time the Court will set down for hearing the evidentiary hearing needed to resolve the remaining issues if the parties cannot reach an agreement as to value as set forth in the statute. The hearing will follow the 60 day time allocated per the statute.
>
> b. During the 60 day period following the election to purchase, the parties are to attempt to set the gross value of [Strohmyer's] common stock and the terms of payment. The Court will thereafter involve itself, if needed, in determining the effect of the remaining unresolved issues on the value and any other matters associated with the judicial dissolution statute.

On July 13, 2015, defendants filed an election to purchase Strohmyer's stock in PFM in accordance with a July 7, 2015,

---

[2] Neb. Rev. Stat. § 21-2201 et seq. (Reissue 2012).

agreement between the parties. The 60-day period for the parties to determine whether they could reach fair value expired without agreement.

Following a March 21, 2016, hearing, the court held that in determining the value of the stock of PFM on April 1, 2014, "the most compelling [are] Exhibits #46 and #113." The court stated that in each of these exhibits, "[Strohmyer] used the appraised value of the fixed assets proposed by [his] expert, being Exhibit #36 of a value of $79,495." However, the court found Naegele's testimony most persuasive, placing "the value of the fixed assets at $19,765, based upon cost when he purchased them on E-Bay." The court accordingly adjusted "the fair value of the Stock in Exhibits 46 and 113 by $19.91 per share," which set "a value per share on Exhibit #46 at $96.35 per share and on Exhibit #113 at $113.09, for an average fair value per share of $104.72," thus, "setting the value of [Strohmyer's] stock at $104,720.00." The court then ordered that "the value of [Strohmyer's] stock is fixed in the amount of $104,220." (This is an apparent contradiction. Our calculations indicate that the proper value based on the district court's calculation is $104,720.)

The court also found that there was "no goodwill or intangible value to [the] medical practice, where one of the physicians leaves and takes his patients and part of the staff with him."

The court next found that under § 48-1229 of the Act, Strohmyer was not entitled to compensation for March 2014. The court held that none of the physicians met the definition of an employee under the Act and that any sums due did not fall within the Act, because (1) there were no employment agreements between PFM and the physicians which set out specific compensation, (2) each of the physicians set his own schedule and saw his own patients, and (3) there was no evidence that the monthly payments to the physicians were paid as "W-2 wages or 1099 compensation."

The court found that "Exhibit #18 is the correct determination of the amounts due to [Strohmyer] for the period of

March 2014." Accordingly, Strohmyer was awarded the sum of $9,389.27 as unpaid compensation. The court stated that "the director's fees which were being held in trust, have been considered in the Court's valuing of [Strohmyer's] stock."

Next, the court concluded that due to the lack of employment contracts, [Strohmyer] did not breach a fiduciary duty when he worked 3 days per week for 4 years, because no fiduciary duty had been created. In addition, the court held that Strohmyer breached a fiduciary duty by treating Medicaid patients after the board of directors made a decision to cease treatment of Medicaid patients. The court determined that Strohmyer damaged PFM in the amount of $30,673.

## III. ASSIGNMENTS OF ERROR

Strohmyer assigns, restated and consolidated, that the district court erred in (1) miscalculating the value of PFM's share value and the amount of fixed assets due to Strohmyer, which led to an inequitable result; (2) finding that PFM had no compensable goodwill to which Strohmyer was entitled; (3) relying upon the values obtained from eBay in determining the replacement cost for medical equipment; (4) not awarding compensation for director fees, salary, and attorney fees as an employee covered by the Act; and (5) finding that Strohmyer breached a fiduciary duty by continuing to accept Medicaid patients, holding him liable for a physician assistant's continued treatment of Medicaid patients, and in its calculation of damages based on these claims.

On cross-appeal, PFM assigns, restated and consolidated, that the district court erred in finding that Strohmyer owed no fiduciary duty to the corporation to work 4 days per week and compensating PFM for this breach even though the court found that Strohmyer owed a fiduciary duty to the corporation to cease taking Medicaid patients.

## IV. STANDARD OF REVIEW

[1] In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches

a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[3]

[2] The existence of a fiduciary duty and the scope of that duty are questions of law for a court to decide.[4]

## V. ANALYSIS

### 1. PFM's Net Equity

Strohmyer argues that the district court miscalculated the value of PFM's shares. The lower court held that Strohmyer's stock was worth $104,720. We note that the court made a minor misstatement of the numbers when it then ordered "the value of [Strohmyer's] stock is fixed in the amount of $104,220." The lower court based its calculation on the following exhibits.

### (a) Exhibit 46

In exhibit 46, entitled "Reconciliation of Assets as of March 31, 2014," the "Total Adjusted Assets" are listed as $348,767.90, or $116.26 per share. Exhibit 46 was drafted by Strohmyer's expert witness Todd Lehigh.

### (b) Exhibit 113

Exhibit 113, entitled "Reconciliation of Net Liquid and Fixed Assets Before Intangibles & Goodwill as of March 31, 2014," lists the net equity before intangibles/business goodwill at $401,174.14. Exhibit 113 was also drafted by Lehigh. Exhibit 113 contains the same values as exhibit 46, and in addition includes: prepaid supplies on hand ($11,829.86), other

---

[3] *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005).

[4] *In re Estate of Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014), *modified on denial of rehearing* 290 Neb. 392, 861 N.W.2d 682 (2015).

fixed assets per exhibit 35 ($79,545), daily supplies ($31,774), adjusted accounts receivable ($143,043.60), accounts payable ($11,185.41), payroll taxes ($3,391.32), and salary due to Strohmyer ($9,389.27).

### (c) Exhibits 35 and 36

Exhibit 36 is a copy of the notes written by Strohmyer's expert witness Doug Killion, for his retrospective appraisal report. That report valued PFM's fixed assets at $79,545, based on the fair market value. Killion's report is found in exhibit 35.

### (d) Exhibit 98

Exhibit 98 is a calculation by Naegele of the value of PFM's fixed assets based on the cost of each item in similar condition found on "eBay and Craigslist." Exhibit 98 contains the same items described in exhibit 36, but calculates the fair market value at $19,755.

### (e) Trial Court's Calculation

The trial court found that exhibits 46 and 113 were credible valuations of the corporate shares of PFM. However, the court found that Naegele's assessment of fixed assets in exhibit 98 was a more persuasive valuation than Killion's assessment in exhibit 36. Because the share values in exhibits 46 and 113 were based on the cost of replacement in exhibit 98, the court adjusted the values in exhibits 46 and 113. The court accordingly subtracted the difference in cost of replacement between exhibits 36 and 98 and divided it by 3,000 shares, which equaled $19.91 per share.

For exhibit 46, the court deducted $19.91 in calculating the amount of $96.35 per share. For exhibit 113, the court deducted $19.91 to arrive at $113.09 per share. The court then averaged these two amounts. The average value was $104.72. Each director was issued 1,000 shares; therefore, the court multiplied $104.72 by 1,000 to arrive at a value of $104,720 for Strohmyer's shares.

### (f) Errors in Trial Court's Calculation

#### (i) PFM's Share Value

Strohmyer argues that the district court miscalculated the value of PFM's shares by "using inconsistent accounting and averaging logic," which led to an inequitable and unjust result. Strohmyer contends that the court should have awarded him $16,740 as the difference in value between exhibits 46 and 113.

Under a de novo standard of review, we give weight to the lower court's assessments of credibility. However, we find that the district court erred in its calculations using the values in these exhibits.

First, the court made a minor misstatement of the numbers in its calculations. The court stated that the value of fixed assets in exhibit 36 was $79,495, whereas exhibit 36 lists the value of fixed assets as $79,545. In addition, the court stated that Naegele placed the value of the fixed assets at $19,765, when the value listed in exhibit 98 was $19,755.

Second, the court averaged the values calculated in exhibits 46 ($348,767.90) and 113 ($401,174.14). In drafting each of these exhibits, Lehigh included everything listed in exhibit 46 in his valuation in exhibit 113. Because the lower court found exhibit 113 credible, it implicitly found all of the additional line items listed in exhibit 113 to be credible. It is therefore illogical to average the valuation in exhibit 113 with the more basic valuation in exhibit 46.

Because the trial court found the additional line items to be credible, under a de novo standard of review, we find that it should have relied only upon the valuation from exhibit 113. In support of our conclusion that the district court erred in averaging the two exhibits, we note that the adjusted value of exhibit 46 does not contain the fixed asset valuation per exhibit 35 of $79,545. By subtracting the difference in value of fixed assets of $59,790 ($79,545 − $19,755) from the net value in exhibit 113 of $401,174.14, the adjusted net equity value of exhibit 113 should equal $341,384.14.

Third, we find an error in the calculation in exhibit 113. In exhibit 113, "Account Payables" and "Payroll Taxes" are treated as assets. Our review indicates that these items should be treated as liabilities. In Lehigh's testimony, he does not address why he has listed these items as assets rather than as liabilities.

By treating the "Account Payables" and "Payroll Taxes" as liabilities rather than assets, and adjusting the value of fixed assets to the value in exhibit 98 (Naegele's calculation), the adjusted net equity value of exhibit 113 is $312,230.68. Thus, the value of Strohmyer's shares would be $104,077. Despite the lower court's calculation errors, this value is almost the same as the court's valuation of Strohmyer's shares at $104,720. This is not a material difference. Hence, we find no reversible error in the court's ultimate valuation of shares at $104,720.

### (ii) Director Fees

Strohmyer argues that the lower court failed to award one-third of the "Net Quarterly Director Fees" to Strohmyer and that he should be awarded $72,991.22 accordingly.

In exhibit 113, entitled "Reconciliation of Net Liquid and Fixed Assets Before Intangibles & Goodwill," Lehigh calculated the "Total Adjusted Equity Before Director Fees" as $620,147.82. Lehigh then subtracted the "Net Quarterly Director Fees (1/3 for each shareholder)" from the total. In his testimony, Lehigh states that he arrived at the "Net Quarterly Director Fees" amount by adding the following components:

> [C]ash in [the] bank per QuickBooks [in the amount of] 37,143, the litigation escrow account [in the amount] of the 90,000, [and] the outstanding checks from 2008 through 2013 [are also included]. And then . . . the deposits for the carpet, painting, X-ray machine, the real estate taxes and for painting [are included in the amount], and all those numbers totaled the [amount of] 318,973.68.

Lehigh then subtracted $100,000 from this amount for operating capital in the business, based on the testimony of the assistant office manager, to arrive at the value of $218,973.68 as director fees.

The lower court stated in its order that "[Strohmyer] and Defendants were the sole Directors of the Corporation." The court stated thereafter that "[Strohmyer] for the two years prior to his departure refused to attend Director's meetings." The court further noted that "the director's fees which were being held in trust, have been considered in the Court's valuing of [Strohmyer's] stock."

In exhibit 46, director fees were not listed in the valuation of PFM's net equity. In exhibit 113, as mentioned above, director fees were subtracted in valuing the net equity. Therefore, in its calculation of net equity owed to Strohmyer, the court awarded only one-third of the value of PFM. It merely subtracted the director fees from the total net equity and did not make a separate finding of the amount of director fees due to Strohmyer. Our reading of the record is that the lower court made a factual finding that Strohmyer was a director of PFM, but that Strohmyer was not entitled to director fees, because he did not attend directors' meetings. Because this was a factual finding, we hold that under a de novo standard of review, the lower court did not err in finding that Strohmyer was not entitled to director fees.

## 2. GOODWILL

Strohmyer argues that the district court erred in "not awarding an additional $55,000.00 for intangible assets . . . and by treating intangible assets in the same category as goodwill assets."[5] PFM contends that there is "no goodwill to divide upon dissolution of a professional enterprise when the clients remain with the firm taking their files."[6] The district court

[5] Brief for appellant at 31.

[6] Brief for appellees at 23.

held that there was "no goodwill or intangible value to a medical practice, where one of the physicians leaves and takes his patients and part of the staff with him."

In *Taylor v. Taylor*,[7] this court addressed whether a physician's professional corporation, of which he was the sole practitioner and shareholder, had professional goodwill that could be included as an asset in the marital estate upon dissolution of the marriage. In *Taylor*, we characterized goodwill as

"'the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.'"[8]

This court further stated that

where goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of such business. On the other hand, if goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual.[9]

Therefore, we held that in the context of the division of marital property under Neb. Rev. Stat. § 42-365 (Reissue 1984), "goodwill must be a business asset with value independent

---

[7] *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986).

[8] *Id*. at 727-28, 386 N.W.2d at 856-57.

[9] *Id*. at 731, 386 N.W.2d at 858.

of the presence or reputation of a particular individual, an asset which may be sold, transferred, conveyed, or pledged."[10] Accordingly, "[w]hether goodwill exists and whether goodwill has any value are questions of fact."[11] We held, on those facts, that the district court did not err in concluding that plaintiff's medical practice did not have any compensable goodwill.

In *Detter v. Miracle Hills Animal Hosp.*,[12] this court addressed whether a professional corporation can have goodwill as a distributable asset in a corporate dissolution proceeding. We reiterated the holding in *Taylor*, that "the existence of professional goodwill as a distributable asset presents a question of fact."[13]

In its analysis, the *Detter* court cited *Thomas v. Marvin E. Jewell & Co.*,[14] in which three partners left a partnership to begin their own partnership, and evidence showed that the departing partners took the files of the clients they wished to retain and contacted those clients. After the transition, "[m]ost of the clients stayed with the firm that possessed the client file."[15] We held that the parties received all of the goodwill to which they were entitled, because "each of the two factions took the clients and whatever goodwill was available at the time of dissolution."[16]

Strohmyer's expert witness on intangible asset valuation testified that according to his calculations, the intangible assets were worth $165,000. The witness stated that "from a business appraiser's standpoint . . . there's not business goodwill

---

[10] *Id.* at 731, 386 N.W.2d at 858-59.

[11] *Id.* at 732, 386 N.W.2d at 859.

[12] *Detter v. Miracle Hills Animal Hosp.*, 269 Neb. 164, 691 N.W.2d 107 (2005).

[13] *Id*. at 175, 691 N.W.2d at 115-16.

[14] *Thomas v. Marvin E. Jewell & Co.*, 232 Neb. 261, 440 N.W.2d 437 (1989).

[15] *Id.* at 266, 440 N.W.2d at 441.

[16] *Id*. at 268, 440 N.W.2d at 443.

in this practice, but there's value of intangible assets, identifiable intangibles."

Among these identifiable intangibles, the witness listed PFM's computer system, patient records, and assembled workforce. However, Strohmyer testified that he did not take any patient files, though he did send letters to his patients informing them of his departure. Approximately 50 percent of those patients followed him to his new practice. Naegele testified that eight PFM employees, almost one-third of PFM's staff, also followed Strohmyer to his new practice. Furthermore, Naegele produced a spreadsheet showing that there was a $543,578.22 decrease in PFM revenues between the last 9 months of 2013, while Strohmyer was at PFM, and the last 9 months of 2014, after Strohmyer had departed. While Strohmyer's witness testified that there were unidentified intangible assets with value, there was also significant evidence that any goodwill depended on the continued presence of Strohmyer, not merely on PFM.

Similar to *Taylor*, the lower court here heard the expert witnesses and gave more weight to the testimony that there was no goodwill or unidentified intangible value to the medical practice. Under a de novo standard of review, the district court did not err in finding that there was no goodwill to the medical practice. Strohmyer's second assignment of error is without merit.

### 3. Replacement Cost for Medical Equipment

Strohmyer contends that the district court erred in accepting Naegele's testimony about replacement costs for medical equipment over the values testified to by Strohmyer's expert.

### (a) Relevant Law

Generally,

[a]n owner's opinion testimony as to the value of his or her property cannot be based on naked conjecture or solely speculative factors. In addition, purely hearsay

evidence as to the value of a chattel is insufficient as a basis for testimony predicated thereon by the owner. However, information received in part from others has been held to be unobjectionable.[17]

The Iowa Supreme Court, in *W & W Livestock Enterprises, Inc. v. Dennler*,[18] stated that "[i]t is generally held that the price for which personal property sells at a bona fide sale is competent evidence of its value."

In *First Baptist Church v. State*,[19] this court addressed how to determine the market value of the land at issue. We held that

"[m]arket value is not a question of science or skill upon which experts alone may give an opinion. [Citation omitted.] It is necessary only to show that he has the means of forming an intelligent opinion derived from an adequate knowledge of *the nature and kind of property* in controversy, and of *its value*. [Citation omitted.] It is not essential that every witness expressing an opinion shall have all-inclusive information of every detail of the elements entering into the value. . . ."[20]

The Nebraska Court of Appeals has also addressed a similar question and held that it was not an abuse of discretion for the lower court to rely upon a valuation of personal property based on "garage sale and 'craigslist' prices" in a marriage dissolution.[21]

### (b) Testimony at Trial

At trial, several witnesses testified as to the estimation of the value of replacement cost for PFM's medical equipment.

---

[17] 31A Am. Jur. 2d *Expert and Opinion Evidence* § 232 at 267 (2012).

[18] *W & W Livestock Enterprises, Inc. v. Dennler*, 179 N.W.2d 484, 489-90 (Iowa 1970).

[19] *First Baptist Church v. State*, 178 Neb. 831, 135 N.W.2d 756 (1965).

[20] *Id*. at 835, 135 N.W.2d at 758-59 (emphasis in original).

[21] See *McIver v. McIver*, No. A-13-052, 2013 WL 5434646 at *6 (Neb. App. Oct. 1, 2013) (selected for posting to court website).

Strohmyer offered the PFM's accountant's report of the assets, liabilities, and stockholders' equity for income tax basis on December 31, 2013, in which report the medical equipment was valued at \$113,502. Killion, Strohmyer's expert witness, testified that fair market value of the medical equipment was \$79,545.

In addition, during cross-examination, Naegele testified that his estimated values showed the fair value, which he defined as "what is the stuff actually worth, what did I buy it for or could replace it for, and your appraiser defined fair market value in a way that I disagree." He stated that his calculation was the fair and reasonable value because he "bought almost everything used on eBay or Craigslist."

Based on this understanding of fair market value, Naegele prepared exhibit 98, which lists the cost of replacement as \$19,755. In the exhibit, Naegele also included printouts of each of the items and their listed prices on eBay, for which he based his estimations of replacement value.

The lower court judge heard the testimony from each of the witnesses and found Naegele's testimony to be more persuasive. Under a de novo standard of review, we cannot conclude that the district court erred in this finding. Strohmyer's third assignment of error is without merit.

### 4. Awarding Wages Under the Act

Strohmyer argues that the district court erred in failing to award attorney fees, director fees, and salary under the Act. The district court held that none of the physicians met the definition of employees under the Act, nor was there evidence presented that the payments they received were paid as "W-2 wages or 1099 compensation."

An individual is not an employee under the Act if the "individual has been and will continue to be free from control or direction over the performance of such services, both under his or her contract of service and in fact."[22] Testimony established

---

[22] § 48-1229(1)(a).

that Strohmyer set his own work schedule and unilaterally limited the number of days he worked at PFM, did not speak to Naegele and Mantler in the last 2 years before his departure from PFM, and continued to receive Medicaid patients after Naegele and Mantler decided that PFM should no longer treat Medicaid patients. In addition, Strohmyer was not working at PFM under an employment agreement. Accordingly, under § 48-1229, Strohmyer "has been and will continue to be free from control or direction over the performance of such services" and is thus not an employee under the Act. Thus, the district court did not err in finding that Strohmyer was not an employee under § 48-1229. Strohmyer's fourth assignment of error is without merit.

### 5. Fiduciary Duty and Medicaid Patients

Strohmyer next assigns that the district court erred in awarding PFM $30,673 on its allegation that Strohmyer's continued treatment of Medicaid patients was a breach of his fiduciary duty and that the calculation of damages on this claim was purely speculative.

[3,4] An officer or a director of a corporation occupies a fiduciary relation toward the corporation, and must comply with the applicable fiduciary duties in his or her dealings with the corporation and its shareholders.[23] A violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach.[24]

In *D & J Hatchery, Inc. v. Feeders Elevator, Inc.*,[25] this court discussed ratification of a corporate officer's unauthorized acts by the corporation:

---

[23] *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004).

[24] *Id.*

[25] *D & J Hatchery, Inc. v. Feeders Elevator, Inc.*, 202 Neb. 69, 74, 274 N.W.2d 138, 141 (1979).

"'The unauthorized acts of an officer of a corporation may be ratified by the corporation by conduct implying approval and adoption of the act in question. Such ratification may be express, or may be inferred from silence and inaction, and if the corporation, after having full knowledge of the unauthorized act, does not disavow the agency and disaffirm the transaction within a reasonable time, it will be deemed to have ratified it.'"

In a memorandum from Naegele to all clinic staff, dated April 18, 2005, Naegele states that "Mantler's patient list is now closed to all Medicaid patients" and that "Strohmyer and . . . Naegele will continue for the moment to see current Medicaid patients, and will evaluate new Medicaid patients on a case-by-case basis." The minutes for the January 27, 2006, directors' meeting states all three doctors were in attendance and discussed that "Naegele chooses to leave Medicaid" and that "Strohmyer and PA Gilroy will continue to serve Medicaid population. Much of this will be in . . . Strohmyer's nursing home rounds. No other providers at PFM will see Medicaid patients." Naegele testified that at the meeting on January 27, Naegele and Mantler both wanted to discontinue treatment of all Medicaid patients and that Strohmyer disagreed, but this was not written down. Naegele testified that he verbally instructed Strohmyer to close his practice to Medicaid patients in 2006 because the two votes against continuing Medicaid treatment were controlling. Naegele testified that Strohmyer responded that "he would continue to do whatever he wanted to do."

Despite these alleged instances in which Strohmyer was instructed to cease treating Medicaid patients, Naegele also testified that there were "many, many issues" and that he "was afraid of a wrongful termination lawsuit" and "never wanted to confront [Strohmyer] on the issue until he left."

As in *D & J Hatchery, Inc.*, ratification of a corporate officer's unauthorized acts "may be inferred from silence and inaction, and . . . the corporation [had] full knowledge of the

unauthorized act." Naegele's April 18, 2005, memorandum to PFM's staff and the minutes from the January 27, 2006, directors' meeting indicate that the three physicians discussed ceasing treatment of Medicaid patients in 2006, but that they agreed that Strohmyer could continue treating such patients. Naegele provides no evidence of any oral agreement in 2006 that all doctors at PFM must cease taking Medicaid patients.

Even if Strohmyer was not authorized by PFM to accept Medicaid patients, Naegele's testimony, in addition to the meeting minutes and the memorandum, indicates that Naegele and Mantler had full knowledge of Strohmyer's continued treatment of Medicaid patients in 2006. After having full knowledge, they took no action to stop Strohmyer from accepting such patients until Strohmyer filed a complaint in 2014, thus failing to "'disaffirm the transaction within a reasonable time.'"[26] This inaction, from 2006 to the filing of the complaint in 2014, amounts to ratification of Strohmyer's unauthorized acts. Therefore, we conclude that PFM, Naegele, and Mantler ratified Strohmyer's actions. As such, Strohmyer's fifth assignment of error has merit, and the order awarding PFM $30,673 must be vacated.

## 6. PFM's Cross-Appeal

On cross-appeal, PFM assigns that the district court erred in finding that Strohmyer owed no fiduciary duty to the corporation to work 4 days a week and in failing to compensate PFM for this breach. The district court found that PFM had no employment contracts setting out the terms of employment; as such, no fiduciary duty existed. In addition, the court noted that PFM had the authority under the terms of the bylaws to terminate Strohmyer's employment, but failed to do so, and that Strohmyer's work production during the 3 days per week he worked was substantially the same as Naegele's and Mantler's.

---

[26] *Id.*

[5,6] An officer or a director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and should refrain from all acts inconsistent with his or her corporate duties.[27] Partners must exercise the utmost good faith in all their dealings with the members of the firm and must always act for the common benefit of all.[28]

Naegele claims that the three doctors had an oral agreement to work 4 days per week at PFM. Strohmyer contends that no such agreement existed. Through the course of his time at PFM, Strohmyer reduced his hours from 4 days per week to 3 days per week because of his outside employment. The minutes for the directors' meeting held June 23, 2006, at which all three doctors were listed as present, state: "Discussed and agreed: . . . Strohmyer to pursue medical directorship at Midlands. Discussed how that would impact [the] practice." And in a meeting on May 1, 2009, the minutes state:

Strohmyer . . . brought up the possibility that Alegent might offer him a significant amount of money to become a hospital administrator . . . . We therefore had a frank conversation about that and the need to start planning for it. . . . Mantler and . . . Naegele were supportive of what-ever steps he needs to take to best take care of his family and himself . . . .

The minutes from PFM's meetings indicate Strohmyer stated to the other doctors that he would be taking these outside positions and that it could impact his work at PFM. There is no evidence that prior to this litigation, the other doctors attempted to enforce this alleged oral agreement to work 4 days per week. Nor was any evidence introduced that Strohmyer's other employers competed with PFM.

Strohmyer's charges to patients at PFM decreased after taking the positions at Alegent in 2008. However, Strohmyer's charges remained comparable to Naegele's and Mantler's

---

[27] *Bellino v. McGrath North*, 274 Neb. 130, 738 N.W.2d 434 (2007).

[28] *Id.*

between 2008 and 2013. Therefore, we find that neither Strohmyer's work for other employers nor his decision to work 3 days per week at PFM was "inconsistent with his . . . corporate duties" at PFM.[29] Strohmyer did not breach a fiduciary duty to PFM by failing to work at PFM's office 4 days per week. PFM's sole assignment of error on cross-appeal is without merit.

## VI. CONCLUSION

The district court did not err in its ultimate valuation of Strohmyer's shares, in finding that PFM had no goodwill for which Strohmyer was entitled to compensation, in relying upon the values PFM obtained from eBay in determining the replacement cost for medical equipment, and in failing to award compensation for director fees and salary as an employee covered by the Act.

However, we find that the district court erred in finding that Strohmyer breached a fiduciary duty by continuing to accept Medicaid patients, in holding Strohmyer liable for a physician assistant's continued treatment of Medicaid patients, and in its calculation of damages based on these claims. The district court did not err in finding on PFM's cross-appeal that Strohmyer did not breach a fiduciary duty by failing to work at PFM 4 days per week.

Accordingly, we affirm in part, and in part reverse and remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

---

[29] See *id.* at 144, 738 N.W.2d at 446.