IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HOHENSTEIN V. HOHENSTEIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DOUGLAS W. HOHENSTEIN ET. AL, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF COTTONWOOD FLATS, INC., A NEBRASKA CORPORATION, APPELLEES,

V.

LILLIAN HOHENSTEIN, INDIVIDUALLY AND AS TRUSTEE OF THE WILLIAM AND LILLIAN HOHENSTEIN TRUST AND FAMILY TRUST, AND AS DIRECTOR AND OFFICER OF COTTONWOOD FLATS, INC., AND KURT HOHENSTEIN, INDIVIDUALLY, AND AS DIRECTOR AND OFFICER OF COTTONWOOD FLATS, INC., APPELLANT.

Filed August 15, 2023.    No. A-22-108.

Appeal from the District Court for Dakota County: BRYAN C. MEISMER, Judge. Affirmed in part, and in part reversed and remanded with directions.

Kurt A. Hohenstein, pro se.

David E. Copple and Michelle M. Schlecht, of Copple, Rockey, Schlecht, Mason & Werth, P.C., L.L.O., for cross-appellant Kurt A. Hohenstein, as successor trustee of Hohenstein Family Trust.

Andrew T. Schlosser and Susan J. Spahn, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., L.L.O., for appellees.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Kurt Hohenstein, pro se, appeals from the January 19, 2022, order of the district court for Dakota County, which denied his motion for new trial. He assigns error to many of the rulings in

- 1 -

the orders incorporated into the January 3, 2022, final order in this case. A cross-appeal has been filed through counsel by Kurt as the successor trustee of the Hohenstein Family Trust (the Family Trust), another litigant in this action. For the reasons set forth herein, we affirm the orders of the district court in all respects except for the award of attorney fees. To the extent the award included fees resulting from the plaintiffs' derivative claims, it was error to award fees against Kurt individually. We reverse the May 19, 2020, order awarding attorney fees to the extent the award included fees arising from the derivative action, and we remand the cause to the district court with directions as set forth below.

## II. STATEMENT OF FACTS

### 1. PARTIES

William Hohenstein and Lillian Hohenstein had five children: Kurt Hohenstein, Douglas Hohenstein, James Hohenstein, William Hohenstein II, and Sarah Mertes. In 1976, William and Lillian incorporated their farming operation as Cottonwood Flats, Inc.; William and Lillian initially owned all of the stock in Cottonwood Flats, but as described further below, they made certain gifts of stock to each of their children over the years. William and Lillian also established certain trusts as part of their estate planning.

William died on November 3, 2001. Sarah died in 2011 before this action was filed, and her heirs were not made parties. This action arose in 2013 from a dispute among the four living children with respect to various agreements and interests in the family farm. Lillian died in 2015 before trial; the case against her was revived against Kurt as special administrator of her estate. Both Douglas and James died, in 2020 and 2021 respectively, before entry of the final order currently under appeal; the case was revived in the names of their surviving spouses as personal representatives.

### 2. PRE-LITIGATION EVENTS AND TRANSACTIONS

#### (a) Stock Gifts, Trusts, 1994 Agreement, and Annual Valuations

William and Lillian made gifts of equal shares of stock in Cottonwood Flats to each of their children in 1976, 1980, 1994, and 1995 (21.6 shares each in 1976, 12 shares each in 1980, and 14.5 shares each in 1994 and again in 1995). They also made gifts of stock in 1975, which gifts were made in error as Cottonwood Flats was not yet incorporated. The 1975 gifts were subsequently replaced by the 1976 stock certificates.

On August 30, 1994, William and Lillian executed separate revocable trusts as part of their estate plan. We have referred to them throughout as William's Trust (referred to as WLH Trust in some pleadings) and Lillian's Trust (referred to as Marital Trust in some pleadings). After execution of the trusts, William transferred 441 shares of Cottonwood Flats stock to his trust and Lillian transferred 336 shares to her trust. Upon William's death, per the terms of his trust, William's Trust terminated, and the Family Trust was established. At that time, William's Trust held 296 shares of stock which were transferred to the Family Trust.

Also on August 30, 1994, William and Lillian entered into an agreement (the 1994 Agreement) with Kurt, granting Kurt an option to purchase the stock of Cottonwood Flats. Kurt testified that the 1994 Agreement was initially prepared in about 1991 and that he prepared "most"

of the agreement but that he may have consulted with his law partner at the time. The agreement provided that the parties "desired to establish a fixed price for said purchase of property and to modify said price yearly where necessary to reflect either increases or decreases in valuation of said property." The agreement further provided that annually, prior to the execution of the option to purchase by Kurt, the parties to the agreement would "reexamine and reevaluate the property if it is deemed necessary to account for either increases or decreases in value," but that "any increases in value as a result of . . . capital improvements made and paid for by [Kurt], shall not be taken into account in this agreement or in the adjustment of purchase price." The 1994 Agreement was signed by William and Lillian, both individually and as officers of Cottonwood Flats, and by Kurt.

The initial purchase price of Cottonwood Flats under the 1994 Agreement was set at $1,290,000, which William and Lillian believed to be its value at the time. Annual Exhibit A attachments to the agreement, prepared by Kurt, maintained the same purchase price for the corporation from the date of the agreement's execution through 2003. The Exhibit A attachments were signed by William and Lillian through 2001 and by Lillian and Kurt from 2002 through 2010. Language was added to the Exhibit A attachments in 1999, stating, "This valuation is presumed to be the fair market value of the assets of the corporation as a going concern for the purposes of said agreement." In 2004, the value of Cottonwood Flats was reduced to $1,103,400 to reflect that the personal residence occupied by Lillian was no longer owned by the corporation and was owned by Lillian's Trust. The Exhibit A attachments for 2005 through 2010 continued to reaffirm a corporate value of $1,103,400.

In 2009, language was added to the Exhibit A attachment stating:

Furthermore, the parties hereto have executed a formal agreement that establishes the terms and conditions of execution of said Stock Purchase Agreement, which permanently establishes the value of said stock at the value determined herein. Because that agreement forever establishes the terms, including the price of said stock, and that agreement is to be executed and valued the moment after the death of [Lillian], the parties hereby agree that the value determined herein shall be, and remain, the final value for purchase and estate valuation purposes, of the stock subject to the aforesaid agreement.

(b) 2002 Agreement

Lillian, Kurt, the Family Trust, Lillian's Trust, and Cottonwood Flats entered into a stock purchase agreement dated July 1, 2002 (the 2002 Agreement). The 2002 Agreement, prepared by Kurt, summarized the past valuation of Cottonwood Flats at $1,290,000 and acknowledged the transfer of the residence out of the corporation and the reduction of value of Cottonwood Flats to $1,103,400. It set out additional terms regarding the 1994 Agreement, including a provision that the valuation of the shares in the corporation were to be fixed and remain the same without regard to the actual or fair value of the shares. The 2002 Agreement was signed by Lillian individually and in her capacities as grantor and trustee of her trust, trustee and beneficiary of the Family Trust, and as president of Cottonwood Flats. While we do not set forth the details here, we agree with the assessment of the trial court in this case, which found (in an order entered in February 2019) "ample evidence to support a finding that the 2002 Agreement was signed in 2009 and back-dated."

### (c) 2010 Agreement and Transaction

Cottonwood Flats, the Family Trust, Lillian's Trust, and Kurt entered into an agreement to purchase corporate stock dated June 25, 2010 (the 2010 Agreement). Kurt testified that he prepared this agreement "at [Lillian's] direction." The signatures on the agreement (Lillian as president of Cottonwood Flats and trustee of her trust and the Family Trust and Kurt as buyer) are notarized as having been signed on June 25, 2010. The 2010 Agreement expressed the "intent of the Sellers that the execution of the stock purchase agreement occur immediately upon execution." The agreement stated that Kurt was agreeing to buy "296 shares" from Lillian's Trust, "336 shares" from the Family Trust, and "62.6 shares" each from Sarah, William II, James, and Douglas. We note that the agreement incorrectly identifies the amounts of shares held by the two trusts (Lillian's Trust actually held 336 shares and the Family Trust actually held 296). Among other things, the 2010 Agreement stated that Kurt would receive one-fifth of the shares held in the Family Trust and Lillian's Trust as lifetime gifts rather than as devises to be received upon Lillian's death. The agreement states that these gifts reduced Kurt's purchase price of Cottonwood Flats stock held in Lillian's Trust to $273,596.80 and of the stock held in the Family Trust to $310,568.80 (based on the incorrect statements of the amounts of stock held in each trust respectively). The agreement provided for a "final total purchase price" to Sarah and the plaintiffs of $72,372.58 each.

On November 2, 2010, Cottonwood Flats took out a $700,000 loan from Farm Credit Services of America (Farm Credit), with $310,568.80 being paid to Lillian's Trust and $273,596.80 to the Family Trust for Kurt's purchase of the stock held in those trusts. We have referred to Kurt's use of the loan proceeds to purchase Cottonwood Flats stock as the 2010 Transaction. The remaining loan proceeds were used to refinance existing corporate debt ($93,272.07), for expenses incurred to obtain the loan ($2,189), and the rest ($20,373.33) was paid to Cottonwood Flats. Kurt issued a promissory note to Cottonwood Flats in the amount of $584,165.60, verifying that he had personally used that amount of the $700,000 loan to purchase the stock. From that point forward, Cottonwood Flats made the annual payments on the $700,000 loan. Kurt has maintained that he "paid" his proportionate share of the loan payments by reducing the amount owed to him on the promissory notes (described below) for his unpaid salary. Kurt admitted at trial that he never used any money in his possession to pay for his "purchase" of Cottonwood Flats stock. Kurt also used funds from Cottonwood Flats to pay for his purchase of stock from Sarah's husband following her death, again claiming that he used his unpaid compensation from the employment agreements (described below) to make the purchase.

Also on November 2, 2010, Lillian executed a quitclaim deed transferring her home from Lillian's Trust into Cottonwood Flats. Kurt did not pay either Lillian's Trust or Cottonwood Flats for the transfer of the residence back into the corporation.

### (d) Employment Agreements and Promissory Notes

Kurt prepared a series of employment agreements for Cottonwood Flats to pay him an annual salary and corresponding promissory notes for unpaid salary. The employment agreements provided they would continue from year to year at the same salary if a new agreement was not signed. The employment agreements reflect salary amounts of $35,000 in 2002; $50,000 in 2004, 2008, 2011, and 2012; $100,000 in 2013; $125,000 in 2014; and $50,000 in 2015. The promissory notes are for the following amounts: $35,000 in 2002 and 2003; $50,000 each year from 2004

through 2011; and $33,333 in 2012. Lillian signed the employment agreements as president and director of Cottonwood Flats; she signed the promissory notes on the signature line marked "Cottonwood Flats, Inc. Maker." After preparation of the employment agreements and promissory notes, Kurt prepared an agreement stating Cottonwood Flats owed him $478,100 as of November 11, 2010, for unpaid salary from 2002 to 2009.

In its February 2019 order following trial, the district court found the evidence showed that at least some of the employment agreements and corresponding promissory notes were not and could not have been executed in 2002 and that at least some of these documents were prepared by Kurt and signed by Lillian at some unknown date with the execution date backdated. The Cottonwood Flats balance sheet for December 31, 2008, does not acknowledge any debts owed to Kurt. Likewise, the 2009 financial information provided to Farm Credit did not show any debts for unpaid salary to Kurt. The financial officer who prepared the 2010 loan for Cottonwood Flats was not aware the corporation owed Kurt any unpaid salary and testified that he would have been surprised to learn Kurt was claiming he was owed more than $500,000 in unpaid salary.

### 3. PLEADINGS AND PRE-TRIAL PROCEEDINGS

Douglas, James, and William II, individually, (the plaintiffs) filed their original complaint in this case in the district court on November 7, 2013. They filed an amended complaint on August 26, 2014, both individually, and derivatively on behalf of Cottonwood Flats, against Lillian, individually, and as trustee of Lillian's Trust, as trustee of the Family Trust, and as director and officer of Cottonwood Flats, and against Kurt, individually, and as director and officer of Cottonwood Flats. The factual allegations outlined in the amended complaint included references to both the 1994 Agreement and the 2002 Agreement identified above. The plaintiffs alleged that they "did not learn of the existence of either the 1994 Agreement or the 2002 Agreement until on or about July 26, 2010," when they received a letter from Kurt dated July 20 (stating that copies of the agreements were enclosed). The plaintiffs alleged that the agreements were not actually enclosed in Kurt's letter and that they first received copies of them via an email from Kurt dated July 26. They set forth claims for breach of fiduciary duty by Lillian as trustee and by Lillian and Kurt as officers and directors of Cottonwood Flats (in the derivative action), sought both a corporate and a trust accounting (William's Trust and Family Trust), set forth claims for fraud/constructive fraud and undue influence/lack of capacity, and sought declaratory and injunctive relief. They sought an order from the court (1) requiring Kurt and Lillian to account for all assets, income, disbursements, and expenditures of Cottonwood Flats, William's Trust, and the Family Trust from and after November 3, 2001; (2) enjoining Lillian from transferring any further assets of William's Trust or the Family Trust to any person for less than fair value; (3) enjoining the defendants from transferring any further assets of Cottonwood Flats to any person for less than fair value; (4) removing Lillian as trustee of William's Trust and the Family Trust, and appointing a successor trustee; (5) for judgment against the defendants, individually, after the accounting for the balance found due to the trusts and Cottonwood Flats; (6) for recovery of, or imposition of a constructive trust for, assets of the trusts and Cottonwood Flats wrongfully disposed of by the defendants for less than fair value; (7) declaring Kurt to have no standing as co-trustee of William's Trust or the Family Trust, enjoining him from acting as such, and voiding any actions taken by him as co-trustee; (8) declaring the 1994 Agreement, the 2002 Agreement, the 2010 Agreement,

the annual valuations, the 2010 Transaction, and the home transfer invalid and unenforceable; (9) for costs and attorney fees pursuant to Neb. Rev. Stat. § 30-3893 (Reissue 2016) and Neb. Rev. Stat. § 21-2076 (Reissue 2012); and (10) for such further relief as the court deemed just and proper.

On September 29, 2014, Kurt filed a motion to dismiss the plaintiffs' claims for breach of trust and accounting in the corporate derivative action, fraud/constructive fraud, undue influence/lack of capacity, and declaratory/injunctive relief, alleging, among other things, that Cottonwood Flats was a necessary party to the corporate accounting. He also asserted the statute of limitations (SOL) as a defense to those claims. The district court denied Kurt's motion to dismiss. With respect to the SOL defense, the court noted that the SOL for fraud does not begin to run until the discovery of facts sufficient to put an ordinary person on notice of the potential cause of action. The court stated that the complaint was filed on November 7, 2013, within 4 years of the 2010 stock sale and July 26, 2010, the date when the plaintiffs alleged they were placed on notice of the basis for their complaint.

On June 2, 2015, Kurt filed an answer to the amended complaint and a counterclaim. He again asserted that the plaintiffs' claims were barred by the SOL because the plaintiffs had notice of the agreements at issue since 1994, and he asserted that the plaintiffs had failed to name the real party in interest "with respect to elements of said Amended Complaint." In his counterclaim, Kurt sought (1) an order compelling the sale to Kurt of the 1994 and 1995 stock gifts held by the plaintiffs "at the value set by [William] in 2010 [sic]," pursuant to the terms of the 1994 stock purchase agreement; (2) an order finding that the 1975 attempted stock gifts were invalid and that those shares were and should be held by the Family Trust, subject to the terms of the stock purchase agreement "at the value set by [William] in 2010 [sic];" (3) an order finding that Lillian had the right to sell and Kurt had the right to purchase those shares of stock held by Lillian individually in 1994, and later transferred to Lillian's Trust; and (4) attorney's fees, costs, and such other and further relief as the court deemed just and equitable.

### 4. TRIAL

Trial was held before the district court on April 17-21, 2017. The record is voluminous, and we have set forth evidence, in addition to the evidence set forth above about the parties and their dealings, as necessary in the analysis section below. After the plaintiffs rested, the defendants made motions for directed verdicts as to all claims, which were denied by the court except as to the lack of capacity issue; the court granted the motions for directed verdict in that regard and dismissed the portion of the operative complaint claiming Lillian's lack of capacity. At the conclusion of evidence, the defendants renewed their motions for directed verdict as to the remaining claims against them, and the court denied those motions.

### 5. ORDERS FOLLOWING TRIAL

On February 28, 2019, the district court entered its "FINAL ORDER FOLLOWING TRIAL" (which we have referred to as "the February 2019 order following trial"). The court's order included extensive findings of fact, and the court found that Kurt was not a credible witness. The court addressed Kurt's SOL defense, and it specifically found the plaintiffs "were not on notice of the 1994 and 2002 Agreements until 2010," and their claims were not barred by the SOL. The trial court also made specific findings regarding the contracts to which Kurt was a party. It found

that Kurt and Lillian breached their fiduciary duties in multiple ways, engaged in a pattern of self-dealing with respect to Cottonwood Flats, and that Kurt exerted undue influence over Lillian. As a result, the court voided the agreements Kurt had with Lillian. The court ordered 296 shares of stock in Cottonwood Flats obtained by Kurt as part of the 2010 Transaction "restored to the Family Trust" and 336 shares of the shares obtained by Kurt in that transaction "restored to Lillian's Trust." The court entered judgment against Kurt "as Successor Trustee of the Family Trust in favor of Cottonwood Flats" for $273,596.80 "as a return of the purchase price received for 296 shares" of stock; against Kurt "as Successor Trustee of Lillian's Trust in favor of Cottonwood Flats" for $310,568.80 "as a return of the purchase price received for 336 shares" of stock; jointly and severally, against Kurt, personally and as special administrator of Lillian's estate, "in favor of Cottonwood Flats, in the amount and to the extent the Family Trust or Lillian's Trust" was unable to pay the other specified judgments. The court declared null and void all employment agreements entered into between Kurt and Cottonwood Flats from January 1, 2002, to the entry date of the order, all promissory notes issued by Cottonwood Flats in favor of Kurt between those dates, and all other agreements or documents executed by Kurt or Lillian on behalf of Cottonwood Flats to the extent that they were inconsistent with the court's declaration as to the employment agreements and promissory notes. The court set forth instructions with respect to an accounting to be conducted of Cottonwood Flats and detailed certain actions to be taken based on the results of that accounting. The court ordered the payment of the plaintiffs' reasonable attorney fees and costs incurred in prosecuting the action, entering judgment, jointly and severally, against Kurt, personally and as special administrator of Lillian's estate, following an evidentiary hearing to be scheduled within 60 days. Finally, the court denied a motion for sanctions filed by Kurt. The February 2019 order following trial was over 50 pages long, and we have set forth further details of the court's findings and the relief granted as necessary in the analysis section below.

After entry of the February 2019 order following trial, Kurt and the other defendants filed motions for new trial, which were overruled by the district court. The plaintiffs also filed a timely motion to alter or amend, and on May 21, 2019, the court entered an order (the May 2019 order) granting the plaintiff's motion and amending the February 2019 order following trial in certain respects. The May 2019 order provided that the 336 shares of stock obtained by Kurt in the 2010 Transaction were to be transferred to Cottonwood Flats (as opposed to being "restored to Lillian's Trust") and Kurt was to transfer possession of the physical stock certificates to "the Secretary of Cottonwood Flats" (as opposed to "[Kurt] as Successor Trustee of Lillian's Trust"). The February 2019 order following trial was also amended to "intentionally omit[]" the paragraph entering judgment against Kurt as successor trustee of Lillian's Trust in favor of Cottonwood Flats for $310,568.80 "as a return of the purchase price" for the 336 shares.

The original trial judge retired from the bench on May 30, 2019. Proceedings in the case between then and December 2019, when the successor judge was appointed, were heard by an interim judge. Proceedings heard by the interim judge included a motion to alter or amend filed by Kurt on May 31 and overruled by the court on September 9.

### 6. FIRST APPEAL AND SUBSEQUENT PROCEEDINGS

#### (a) First Appeal

In October 2019, Kurt appealed the district court's May 2019 orders granting the plaintiffs' motion to alter or amend and denying his motion for new trial and the September 2019 order denying his motion to alter or amend. In November, this court dismissed his appeal for lack of jurisdiction because the district court had not disposed of all the claims of all the parties as required by Neb. Rev. Stat. § 25-1315(1) (Reissue 2016). See *Hohenstein v. Hohenstein*, 27 Neb. App. xliv (No. A-19-963 Nov. 6, 2019). This court's mandate from the first appeal was filed in the district court on December 11, 2019; it entered judgment on the mandate on December 30.

A status hearing was held before the district court on December 16, 2019. The status hearing and subsequent proceedings in the case were heard by the successor judge. At the status hearing, Kurt made an oral motion for new trial, which was denied by the court.

#### (b) Attorney Fee Hearing

An evidentiary hearing on the amount of plaintiffs' attorney fees was scheduled for January 28, 2020. Kurt filed an objection to the hearing, raising his "due process right to have all of the evidence in this case heard by one judge" arguing, among other things, that "the holding of the hearing on attorney fees evidence or any other matter that [this court] determined had not been finalized, does in fact violate his due process rights."

On February 19, 2020, the district court heard argument and received evidence on the amount of attorney fees and costs previously awarded to the plaintiffs pursuant to the February 2019 order following trial. We have set forth evidence from that hearing as necessary in the analysis section below. On May 19, during the pendency of the second appeal (discussed below), the court entered an order (the May 2020 order on attorney fees), awarding attorney fees to the plaintiffs totaling $401,922.14 and costs totaling $11,136.90.

#### (c) Motions to Vacate and to Dismiss Derivative Action

On December 27, 2019, Kurt filed another motion seeking to vacate the district court's May 2019 order granting the plaintiff's motion to alter or amend the February 2019 order following trial. In his motion to vacate, Kurt argued that the matters this court determined needed resolution prior to an appeal could not be resolved because the judge who presided over the trial was not the same judge presiding over the case at the time. He also argued that the trial court failed to exercise its independent judgment because it adopted the plaintiffs' proposed order verbatim and that the February 2019 order following trial was the result of fraudulent statements made by the plaintiffs in their proposed order. Such alleged fraudulent statements included the plaintiffs' assertion throughout the proceedings that "'they did not learn of the existence of either the 1994 Agreement or the 2002 Agreement until on or about July 26, 2010.'" On February 19, 2020, he filed an amendment to his motion to vacate. In the amendment, Kurt "reaffirm[ed]" the arguments he raised previously. He also argued that the court lacked jurisdiction over the case because Sarah's heirs, who were or would become qualified beneficiaries of the Family Trust, were necessary parties, or indispensable parties in the declaratory judgment cause of action, had never been named as parties in this case.

Following a hearing, the district court entered an order on April 20, 2020, denying Kurt's amended motion to vacate the February 2019 order following trial (as amended by the court's May 2019 order granting the plaintiff's motion to alter or amend). In the April 2020 order, the court noted that in dismissing the first appeal, this court had outlined four items that needed resolution before an appeal could be taken: (1) that an accounting had been ordered and based on the results of that accounting, a further order of monetary judgment was to be entered, (2) that further hearing was to be held on the issue of attorney fees, (3) that an order was to be entered resolving Kurt's counterclaim, and (4) that an order was to be entered resolving the issues of declaratory or injunctive relief. The district court disagreed with Kurt's position that these outlined matters could not be resolved and that the February and May 2019 orders had to be vacated as the original trial judge was no longer presiding over the case. With respect to the first two outlined items, the court determined that its role was one of enforcement and not a matter of judgment on the facts. As to the resolution of the counterclaim and issues of declaratory judgment or injunctive relief, the court found that those issues were in fact specifically addressed in the 2019 orders, although not delineated in the "Relief Granted" section. The court opined that the 2019 judgment of the trial judge who heard and weighed the evidence could be made into a final order based on the language of the order itself. The court discussed the arguments raised by Kurt in his motion to vacate and the amendment to that motion and found them to be without merit.

Also in 2020, Kurt also filed a motion to dismiss the derivative action pursuant to Neb. Rev. Stat. § 21-276 (Reissue 2022) due to lack of standing, alleging that "while the parties are named Plaintiffs derivatively, the real party in interest on that matter here is Cottonwood Flats, Inc." This motion was heard prior to Kurt's second appeal to this court and ruled on during the pendency of that appeal. The district court entered an order on May 18, denying Kurt's motion. The court found nothing to indicate that the individual plaintiffs or their attorneys had acted in a way that would be inconsistent with the best interests of the corporation. Accordingly, the court denied Kurt's motion to dismiss the derivative action for lack of standing.

### 7. SECOND APPEAL AND SUBSEQUENT PROCEEDINGS

#### (a) Second Appeal

On April 21, 2020, Kurt filed the second appeal in this case from the district court's April 20 order denying his amended motion to vacate. In May, this court dismissed his appeal for lack of jurisdiction because there still had not been a disposition of all the claims of all the parties as required by § 25-1315(1). See *Hohenstein v. Hohenstein*, 28 Neb. App. xxx (No. A-20-319 May 13, 2020). This court's mandate from the second appeal was filed in the district court on June 22, 2020; it entered judgement on the mandate on June 23.

#### (b) Accounting and Other Proceedings

On April 28, 2020, Kurt filed a motion to disqualify the successor judge, which was denied by the district court on May 15.

Prior to the second appeal in this case, Kurt filed an objection to holding an evidentiary hearing on the accounting, raising, as he did with respect to an evidentiary hearing on attorney fees, his "due process right to have all of the evidence heard by one judge." Then on September 20, 2021, he filed a motion objecting to holding an evidentiary hearing on the accounting. Kurt

also filed a motion, asking the district court to set a hearing on his counterclaim, contemporaneous with the hearing that had been scheduled on the accounting, and seeking to limit evidence offered at the accounting hearing.

Following a hearing on Kurt's September 20, 2021, motions, the district court entered an order overruling Kurt's objection on due process grounds to holding an evidentiary hearing in the accounting matter. It granted his motion to limit the evidence received, stating that the evidence should "conform to the scope set out" in the February 2019 order following trial and the May 2019 order granting the plaintiff's motion to alter or amend. Finally, the court determined that Kurt's counterclaim would be entertained during the evidentiary hearing on the accounting, that the court may take judicial notice of evidence previously submitted, but that the parties should not offer any new evidence not previously submitted with respect to the counterclaim.

The accounting evidentiary hearing was held before the district court on November 2 and 4, 2021. We have set forth evidence as necessary in the analysis section below.

8. FINAL ORDER AND SUBSEQUENT PROCEEDINGS

A final order was entered by the district court on January 3, 2022. The court entered judgment against Kurt personally in the total amount of $833,485.45. The judgment was comprised of the following items: (1) $283,094 as a return of the amount of interest paid by Cottonwood Flats from November 2, 2011, through December 31, 2019, for that portion of the $700,000 loan from Farm Credit attributable to Kurt's purchase of Cottonwood Flats stock from Lillian's Trust and the Family Trust; (2) $480,718.58 as a return of the amount of salary or other compensation payments made by Cottonwood Flats to Kurt or to any third party on his behalf from January 1, 2002, through December 31, 2019; and (3) $68,862.87 as a return of the amount of other disbursements or payments made by Cottonwood Flats to Kurt or any third party on his behalf from January 1, 2002, through December 31, 2019, which were not approved either by unanimous consent of the shareholders or a majority of shareholders at a meeting called pursuant to Nebraska law following notice to all shareholders. The court ordered Kurt to transfer an additional 43.4 shares of Cottonwood Flats stock to Cottonwood Flats (equivalent to 69.3-percent of the 62.6 shares purchased from Sarah's husband) and to transfer possession of the physical stock certificates to the secretary of Cottonwood Flats and take all necessary steps to record the transfer on the corporate books within 30 days of the court's order. Next, the court found that, consistent with the findings and determinations set forth in the February 2019 order following trial and the May 2019 order granting the plaintiffs' motion to alter or amend, Kurt's counterclaim was denied. Also consistent with the findings and determinations set forth in those prior orders, the court granted declaratory judgment in favor of the plaintiffs as previously set forth and found that no further declaratory judgment was to be awarded. And, it granted injunctive relief in favor of the plaintiffs as previously set forth, except that Kurt was ordered to transfer possession of the physical stock certificates to the secretary of Cottonwood Flats and take all necessary steps to record the transfers of such stock on the corporate books within 30 days of the court's order. The court stated that no further injunctive relief was awarded other than the transfer of the additional shares of stock set forth in its order. Finally, the court stated that its order was intended to be a final appealable order, incorporating the findings, conclusions, and awards set forth in the February 2019 order following

trial, the May 2019 order granting the plaintiff's motion to alter or amend, and the May 2020 order regarding attorney fees, and denying any other motions that may be pending.

Kurt filed a motion for new trial, which was denied by the district court on January 19, 2022. He then perfected the present appeal to this court.

## III. ASSIGNMENTS OF ERROR

Kurt assigns, restated and reordered, that the district court erred in (1) deciding the trust claim because Sarah's heirs were qualified beneficiaries and indispensable parties, (2) deciding the derivative action because Cottonwood Flats is the real party in interest and an indispensable party, (3) determining that the allegations of the amended complaint related back to the date of the original filing, (4) determining that the plaintiffs first had knowledge of sufficient facts to put them on notice of inquiry on July 26, 2010, and that the 4-year SOL did not bar the plaintiffs' recovery, (5) adopting the plaintiffs' proposed order verbatim following trial, (6) entering judgment against Lillian's Trust in the February 2019 order following trial, (7) finalizing the February 2019 order, (8) allowing the plaintiffs to offer evidence of documents not pled in the amended complaint and which they failed to timely supplement in violation of the court's progression order, (9) permitting testimony about Kurt's purchase of Sarah's stock, (10) awarding attorney fees in the derivative action against an individual director rather than Cottonwood Flats, (11) entering judgment against Kurt for certain expenses and using the wrong standard in determining whether the expenses were properly included in a judgment against an individual director, (12) concluding that the 1976 stock certificates constituted constructive gifts to the appellees, (13) finding that Lillian's actions as successor trustee of the Family Trust breached any fiduciary duties and were the result of undue influence, and (14) making certain findings regarding Kurt's work for Cottonwood Flats.

On cross-appeal, the Family Trust assigns that the district court erred in (1) finding that Lillian breached her fiduciary duties as trustee of the Family Trust and (2) finding that Lillian was subject to undue influence by Kurt and that the 2010 Transaction was the result of undue influence.

## IV. STANDARD OF REVIEW

A shareholder's derivative action which seeks an accounting and the return of money is an equitable action. *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004). In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Strohmyer v. Papillion Family Medicine*, 296 Neb. 884, 896 N.W.2d 612 (2017).

Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record. *In re Margaret L. Matthews Revocable Trust*, 312 Neb. 381, 979 N.W.2d 259 (2022).

A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Preserve the Sandhills v. Cherry County*, 313 Neb. 668, 986 N.W.2d 265 (2023).

The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong. *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021). The question of which statute of limitations applies is a question of law that an appellate court must decide independently of the conclusion reached by the trial court. *Trausch v. Hagemeier*, 313 Neb. 538, 985 N.W.2d 402 (2023).

Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law. *Id.*

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *In re Estate of Koetter*, 312 Neb. 549, 980 N.W.2d 376 (2022). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Buttercase v. Davis*, 313 Neb. 1, 982 N.W.2d 240 (2022). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Trausch v. Hagemeier, supra*.

On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Echo Group v. Tradesmen Internat.*, 312 Neb. 729, 980 N.W.2d 869 (2022).

Whether a breach of fiduciary duty has occurred is a question of fact. *In re Estate of Lakin*, 310 Neb. 271, 965 N.W.2d 365 (2021), *modified on denial of rehearing* 310 Neb. 389, 966 N.W.2d 268.

## V. ANALYSIS

### 1. JURISDICTION AND PROCEDURAL ERRORS

#### (a) Subject Matter Jurisdiction

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, and this is so even where neither party has raised the issue. *Ryan v. Ryan*, 313 Neb. 938, 987 N.W.2d 620 (2023). The absence of an indispensable party to a controversy deprives the court of subject matter jurisdiction to determine the controversy and cannot be waived. *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017). Where a lower court lacks subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *In re Margaret L. Matthews Revocable Trust, supra*.

Kurt assigns that the district court erred in deciding the trust claim because Sarah's heirs were qualified beneficiaries and indispensable parties and deciding the derivative action because Cottonwood Flats is the real party in interest and an indispensable party. Accordingly, before turning to Kurt's other assigned errors, we first determine whether we have jurisdiction.

*(i) Sarah's Heirs*

Neb. Rev. Stat. § 25-323 (Reissue 2016) provides that the court "may determine any controversy between parties before it when it can be done without prejudice to the rights of others or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in." The Nebraska Supreme Court has interpreted the first clause of this statute to apply to "necessary parties" and the second clause to apply to "indispensable parties." See *Midwest Renewable Energy v. American Engr. Testing, supra*. Necessary parties are parties who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence. *Davis v. Moats*, 308 Neb. 757, 956 N.W.2d 682 (2021). The inclusion of a necessary party is within the trial court's discretion. *Id.* Indispensable parties are parties whose interest is such that a final decree cannot be entered without affecting them, or that termination of controversy in their absence would be inconsistent with equity. *Id.* There is no discretion as to the inclusion of an indispensable party. *Id.*

A trial court should cause an action to be properly amended to bring in the indispensable party, or dismiss it, if the amendment is not made. *Id.* Whether a person is "indispensable," that is, whether a particular lawsuit must be dismissed in the absence of that person, can be determined only in the context of particular litigation. *Id.*

Sarah's heirs are qualified beneficiaries of the Family Trust, but the parties dispute whether they are indispensable parties or only necessary parties. In his February 2020 amended motion to vacate, Kurt raised the issue of the district court's lack of subject matter jurisdiction due to the failure to name Sarah's heirs as parties. In his motion, he noted a pretrial motion by the plaintiffs to consolidate this case with a case involving Lillian's estate and a case involving Lillian's Trust (in which Sarah's heirs were included as defendants). At the hearing on Kurt's motion, the plaintiffs offered affidavits from Sarah's heirs, stating that in August and November 2016, they had been provided copies of county court pleadings concerning Lillian's estate (the amended complaint in this case was attached as an exhibit to one of the pleadings referenced in the affidavits); that they had been aware since at least August 2016 of ongoing litigation between Douglas, James, William II, Kurt, and Lillian, involving various trusts and corporate assets; that they decided in August and November 2016 not to become actively involved in the litigation; and that not being involved continued to be their choice as of the dates of their respective affidavits.

In denying Kurt's motion, the successor judge stated that the trial judge had an opportunity to rule on the indispensability of the residual beneficiaries prior to trial and chose not to include them. The judge stated further that it was not his role to review a record of proceedings presided over by his predecessor and second guess decisions. The judge also cited, as do the plaintiffs in arguing that Sarah's heirs are necessary but not indispensable parties, this court's decision in *In re Trust Created by Augustin*, 27 Neb. App. 593, 935 N.W.2d 493 (2019).

The *Augustin* case involved consolidated lawsuits brought by three brothers, beneficiaries and trustees of family trusts holding certain farmland. The brothers' sister, who was also a qualified beneficiary of the trusts, was not named as a party. This court determined that even if the sister was a necessary party with respect to disputes as to the farmland at issue, her inclusion was discretionary, and the trial court could decide matters relating to the disputed farmland (including

whether the trustees breached their duties in handling the disputed farmland) without her presence. However, we found that the sister was an indispensable party with respect to requests to terminate the trusts, remove the trustees, order an accounting, and appoint a successor trustee, and accordingly, the trial court was without jurisdiction to address those matters. Although we affirmed the trial court's determination that the trustees engaged in a breach of trust with respect to the disputed farmland, we remanded the issue of a remedy for that breach for further consideration once the sister was included as a party.

Here, the lawsuit does not involve any requests to terminate the Family Trust, and although the plaintiffs initially sought to remove Lillian as trustee of the Family Trust and Lillian's Trust and appoint a successor trustee, such became unnecessary when Kurt became the successor trustee of those trusts upon Lillian's death. The accounting ordered by the district court in the February 2019 order following trial was of Cottonwood Flats, not the Family Trust. Finally, the relief ultimately granted by the court voided agreements between Kurt and Lillian, and required Kurt to return stock and pay money to Cottonwood Flats. Under these circumstances, we agree with the plaintiffs' assertion that *Augustin* is distinguishable from the present case. In the context of this particular litigation, we find no error in the determination that Sarah's heirs are necessary rather than indispensable parties.

Kurt references the fact that the plaintiffs also sought declaratory judgment with respect to certain matters and cites *Bayliss v. Clason*, 26 Neb. App. 195, 918 N.W.2d 612 (2018) for the proposition that the presence of necessary parties in declaratory judgment actions is jurisdictional and cannot be waived, and if such persons are not made parties, then the district court has no jurisdiction to determine the controversy. More recently, the Nebraska Supreme Court clarified that the rule in a declaratory judgment action is that all who have or claim any interest which would be affected by the declaration sought are indispensable parties, and when all such parties have not been joined, the district court has no jurisdiction to determine the controversy. *SID No. 2 of Knox County v. Fischer*, 308 Neb. 791, 957 N.W.2d 154 (2021). In a declaratory judgment action, a party is "indispensable" when the party has an interest in the controversy to an extent that such party's absence from the proceedings prevents the court from making a final determination concerning the controversy without affecting such party's interest. *Id.* See, also, Neb. Rev. Stat. § 25-21,159 (Reissue 2016). In the operative complaint, the plaintiffs sought declarations that Kurt had no standing as co-trustee of William's Trust or the Family Trust and that the 1994, 2002, and 2010 agreements, the annual valuations, the 2010 Transaction, and the home transfer were invalid and unenforceable. As noted above, Kurt became the successor trustee of the trusts upon Lillian's death, the Family Trust remained intact, and Kurt was ordered to return stock and pay money to Cottonwood Flats. As noted by the plaintiffs, the end result of the court's various orders is to place the trust back into the position it had been prior to the suit being filed. Although Sarah's heirs, as residual beneficiaries under the trust, had an interest in the litigation, their absence did not prevent the court from making these final determinations. Their interests aligned with the plaintiffs and were clearly protected in this litigation. We do not find that Sarah's heirs were indispensable parties with respect to the declarations sought and ultimately granted. This assignment of error fails.

- 14 -

*(ii) Cottonwood Flats*

Kurt argues that the addition of the derivative action on behalf of Cottonwood Flats in the amended complaint required the plaintiffs to name Cottonwood Flats as a party and bring it into the case by service of process.

A derivative action is a suit brought by a shareholder to enforce a cause of action belonging to the corporation. *McGill v. Lion Place Condo. Assn*, 291 Neb. 70, 864 N.W.2d 642 (2015). Pursuant to § 21-276, a shareholder may commence or maintain a derivative proceeding if the shareholder "[w]as a shareholder of the corporation at the time of the act or omission complained of" and "[f]airly and adequately represents the interests of the corporation in enforcing the right of the corporation."

To support their argument that they were not required to name Cottonwood Flats as a party in this case, the plaintiffs point to both statutory and case law. First, the plaintiffs note Neb. Rev. Stat. § 25-304 (Reissue 2016), which provides that "a person expressly authorized by statute, may bring an action without joining the person for whose benefit it is prosecuted." Next, the plaintiffs note *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004), wherein the Nebraska Supreme Court observed that as a general rule, a shareholder may not bring an action in his or her own name to recover for wrongs done to the corporation or its property. Such a cause of action is in the corporation and not the shareholders. *Id.* The right of a shareholder to sue is derivative in nature and normally can be brought only in a representative capacity for the corporation. In legal effect, a stockholders' derivative suit is one by the corporation conducted by the stockholder as its representative. *Id.* The stockholder is only a nominal plaintiff, the corporation being the real party in interest. *Id.* The plaintiffs in the present case note that, just as in this case, "the *Trieweiler* case was captioned in the name of the shareholder, 'individually and on behalf of' the corporation, but the corporation was never named as a party." Brief for appellees plaintiffs at 37. See, also, *Trieweiler v. Sears*, 268 Neb. at 952, 689 N.W.2d at 807.

In arguing that the addition of the derivative action on behalf of the corporation required the plaintiffs to name Cottonwood Flats as a party and bring it in to the litigation by service of process, Kurt cites to *Wells Fargo Ag Credit Corp. v. Batterman*, 229 Neb. 15, 424 N.W.2d 870 (1988). The case does not stand for that proposition; rather, it observes, as did the *Trieweiler* case, that shareholders may not bring actions in their own names to recover for wrongs done to the corporation, that such causes of action belong to the corporation, not the shareholders, and that a shareholder's right to sue on behalf of a corporation is derivative and can be brought by shareholders in a representative capacity for the corporation. See *Wells Fargo Ag Credit Corp. v. Batterman, supra*. Here, the plaintiffs, who are shareholders, exercised their right to sue on behalf of Cottonwood Flats and brought suit (with respect to the derivative action) in their representative capacity for the corporation. And, to the extent Kurt suggests that the plaintiffs' requests for declaratory judgment relief required them to name Cottonwood Flats as a party, we reject that argument. See *SID No. 2 of Knox County v. Fischer, supra*. Kurt also cites *Smith v. Sperling*, 354 U.S. 91, 77 S. Ct. 1112, 1 L. Ed. 2d 1205 (1957) (concerning alignment of parties for purposes of federal diversity jurisdiction in stockholder's derivative suit where corporation had been named as party defendant), which is not relevant to the issues on appeal in this case. This assignment of error fails.

(b) SOL

Kurt assigns that the district court erred in determining that the plaintiffs first had knowledge of sufficient facts to put them on notice of inquiry on July 26, 2010, and that the 4-year SOL did not bar the plaintiffs' recovery. Kurt's arguments focus on the 4-year SOL for fraud as alleged in the derivative claims and the court's finding that the plaintiffs were not on notice of the 1994 and 2002 agreements until 2010. Accordingly, we have not addressed the court's findings with respect to the SOL under the Nebraska Uniform Trust Code (NUTC) with respect to the trust claims. Kurt's arguments and the court's findings with respect to the fraud SOL implicate the interplay between the discovery rule and the continuing tort doctrine.

Generally, a cause of action accrues and the period of limitations begins to run upon the violation of a legal right, that is, when the aggrieved party has the right to institute and maintain suit. *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). For a limitations period to begin to run, it is not necessary that a plaintiff have knowledge of the exact nature or source of a problem, but only that a problem exists. *DeLaet v. Blue Creek Irr. Dist.*, 23 Neb. App. 106, 868 N.W.2d 483 (2015).

Neb. Rev. Stat. § 25-207(4) (Reissue 2016) provides that an action on the ground of fraud can only be brought within 4 years, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud. A plaintiff seeking to invoke the discovery clause to toll the statute of limitations must allege facts showing why the cause of action reasonably could not have been discovered during the limitations period. *Kalkowski v. Nebraska Nat. Trails Museum Found.*, 20 Neb. App. 541, 826 N.W.2d 589 (2013). An action for fraud does not accrue until there has been a discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on an inquiry, which, if pursued, would lead to such discovery. *Chafin v. Wisconsin Province Society of Jesus*, 301 Neb. 94, 917 N.W.2d 821 (2018). Discovery, as applied to the statute of limitations, occurs when one knows of the existence of an injury or damage and not when he or she has a legal right to seek redress in court. *Id.*

As to the continuing tort doctrine, it is well accepted that when an individual is subject to a continuing, cumulative pattern of tortious conduct, capable of being terminated and involving continuing or repeated injury, the SOL does not run until the date of the last injury or cessation of the wrongful action. *Colwell v. Mullen*, 301 Neb. 408, 918 N.W.2d 858 (2018). The continuing tort doctrine requires that a tortious act—not simply the continuing ill effects of prior tortious acts—fall within the limitation period. *Id.* Nor can the necessary tortious act merely be the failure to right a wrong committed outside the statute of limitations, because if it were, the statute of limitations would never run because a tort-feasor can undo all or part of the harm. *Id.* Rather, when a tort is continuing, although the initial tortious act may have occurred longer than the statutory period prior to the filing of an action, an action will not be barred if it can be based upon the continuance of that tort within that period. *Id.*

The Nebraska Supreme Court discussed how the discovery rule affects the SOL for a continuing tort doctrine in *Alston v. Hormel Foods Corp.*, 273 Neb. 422, 730 N.W.2d 376 (2007). The *Alston* case involved a situation wherein the plaintiff filed suit within 4 years of the cessation of the defendant's continuing tortious conduct, but she discovered the effect of that alleged conduct more than 4 years prior to filing suit. After outlining the basic principles of law with respect to the

- 16 -

continuing tort doctrine, as we have done above, the Supreme Court concluded that a claim for damages caused by a continuing tort can be maintained for injuries caused by conduct occurring within the statutory limitations period. *Id.* It stated further that when there are continuing or repeated wrongs that are capable of being terminated, a claim accrues every day the wrong continues or each time it is repeated, the result being that a plaintiff is only barred from recovering those damages that were ascertainable prior to the statutory period preceding the lawsuit. *Id.*

After concluding that the plaintiff's claim was not time barred with respect to damages caused by conduct within the statutory limitations period, the *Alston* court discussed the question of whether the plaintiff could recover for that period despite the fact that she discovered or should have discovered her injury before then, explaining:

> For a continuing tort, the statute of limitations runs from the time of the last injury or the time that the tort-feasor's tortious conduct ceases. But under the discovery rule, the statute of limitations runs from the time that the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury. Obviously, if a continuing tort is not discovered, the discovery rule may toll the statute of limitations with respect to the entire claim.

*Id.* at 431, 730 N.W.2d at 384 (internal citations omitted). The Supreme Court went on to state:

> In those cases in which the discovery rule applies, the beneficence of the discovery rule is not bestowed on a potential plaintiff where the potential plaintiff in fact discovers, or in the exercise of reasonable diligence should have discovered, the injury within the initial period of limitations running from the wrongful act or omission. However, in a case where the injury is not obvious and is neither discovered nor discoverable within the limitations period running from the wrongful act or omission, the statute of limitations does not begin to run until the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury.

*Id.* at 432, 730 N.W.2d at 385 (internal citations omitted). Finally, the Supreme Court concluded that "in a continuing tort case, where the discovery rule is not applicable, § 25-207 applies according to its terms: A claim for damages from a continuing tort may be brought to the extent that the claim accrued within the statutory limitations period." *Alston v. Hormel Foods Corp.*, 273 Neb. at 435, 730 N.W.2d at 387.

In this case, the district court made detailed factual findings with respect to the plaintiffs' lack of notice of the 1994 and 2002 agreements, i.e., when they discovered their injury, and it concluded that the plaintiffs were not aware of the existence of the agreements until receiving a July 20, 2010, letter from Lillian. It also found that they first received copies of the agreements after following up via email to Kurt in response to the July 20 letter. In addressing the defendants' SOL defense, the court repeated its finding that the plaintiffs were not on notice of the 1994 and 2002 agreements until 2010. Additionally, the court went on to make findings with respect to the continuing tort doctrine. Specifically, it found that the evidence showed the defendants set the value for Cottonwood Flats on an ongoing and annual basis through 2010, Kurt did not exercise his option to purchase shares of Cottonwood Flats until 2010, and the transaction did not actually occur until November 2, 2010. The court cited the continuing tort doctrine and stated that the

defendants could have corrected the corporate value to reflect actual fair market value at any time prior to the actual transfer of the stock. The court determined that the final instance of improper conduct in this case did not occur until consummation of the stock sale on November 2, 2010, and that no damages occurred until that date. In sum, although not explicitly stated, the court determined that the plaintiffs did not discover their injury until July 2010, that the defendants' wrongful actions continued until November 2010, and that the plaintiffs' complaint, filed in November 2013 was within the limitations period with respect to both the discovery rule and the continuing tort doctrine.

The plaintiffs argue that the SOL period is not an issue because the transactions at issue constituted continuing acts on the part of the defendants. However, the Nebraska Supreme Court's discussion in *Alston v. Hormel Foods Corp., supra*, illustrates that we must also determine whether the discovery rule is applicable to this case. Accordingly, we address the parties' arguments with respect to the plaintiffs' notice of the 1994 and 2002 agreements.

In arguing that the plaintiffs had knowledge of sufficient facts to put them on notice of inquiry prior to July 2010, such that the 4-year SOL bars recovery on their fraud claims, Kurt relies primarily on language on the 1994 and 1995 Cottonwood Flats stock certificates stating, "Transfer subject to restrictions in the Shareholders Agreement." He cites "Neb. Rev. Stat. §[ ]21-248 (Reissue 2012)," which does not exist. Brief for appellant at 32. Presumably, he is referring to Neb. Rev. Stat. § 21-248 (Cum. Supp. 2014) (effective January 1, 2016). See, also, Neb. Rev. Stat. § 21-248 (Reissue 2022). Section 21-248 permits shareholders to agree to restrict the transfer of stock they own, making such restrictions "valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this section and its existence is noted conspicuously on the front or back of the certificate."

Clearly, this statutory provision was enacted after the stock gifts in question were made. In 1994, prior to the adoption of Nebraska Model Business Corporation Act (NMBCA), the Nebraska Business Corporation Act (NBCA) did not contain any provisions providing for enforceability of stock restriction language. See Neb. Rev. Stat. § 20-2001 et seq. (Reissue 1991). Language about stock restrictions did not appear in the NBCA until it was substantially rewritten in 1995 with changes becoming effective in 1996. See, Neb. Rev. Stat. § 21-2014(3) (Supp. 1995) (1995 Neb. Laws, LB 109, § 14, effective January 1, 1996) (defining the term "conspicuous"); Neb. Rev. Stat. § 21-2046 (Supp. 1995) (1995 Neb. Laws, LB 109, § 46, effective January 1, 1996) (concerning restrictions on transfer or registration of shares or other securities).

Kurt also cites, Neb. U.C.C. § 8-204 (Reissue 2020), which provides for a restriction on transfer of a security imposed by the issuer where the restriction is noted conspicuously on the security certificate. The plaintiffs note comment 5 of § 8-204, which explains, "This section deals only with restrictions imposed by the issuer. Restrictions imposed by statute are not affected. Nor does it deal with private agreements between stockholders containing restrictive covenants as to the sale of the security." (Citations omitted). Neb. U.C.C. § 1-201(10) (Reissue 2020) defines "[c]onspicuous" with reference to a term as meaning written, displayed, or presented so that a reasonable person against which the term is to operate ought to have noticed it. Methods for making a term conspicuous include using larger type than that of the surrounding text; using a contrasting type, font, or color from surrounding text of the same size; or setting off text from surrounding text by symbols or other marks that call attention to the language. See *id.*

The plaintiffs argue that the stock restriction language in this case is vague and not conspicuous. The restriction on the 1994 and 1995 certificates states, "Transfer subject to restrictions in the Shareholders Agreement." This language is not in the largest type on the certificates, and it is of similar size, type, and boldness to the text immediately above it (text below is in a script-style font). Although it appears on a line by itself, the restriction language is not otherwise set off by symbols or other marks calling attention to it.

The plaintiffs argue that even if the applicable statutes in 1994 had provided for the enforceability of a conspicuous stock restriction and even if the "vague language" of the stock certificates was found to be conspicuous, there is still not evidence sufficient to show that the language provided them with sufficient notice of "Kurt's scheme, including his ultimate arguments that corporate valuation should never be changed thus permitting Kurt to purchase corporate stock for a fraction of its value." Brief for appellees plaintiffs at 29. They argue further that Kurt does not cite authority asserting that an enforceable restriction on transfer is equivalent to notice for purposes of an SOL claim. We agree with the plaintiffs and reject Kurt's arguments that the restrictive language on the stock certificates constituted notice for purposes of the SOL discovery rule.

Kurt also argues that the plaintiffs had other clear notice of the agreements more than 4 years prior to filing this case and refers us to certain evidence in the voluminous trial record. And, the plaintiffs point to certain evidence in support of their arguments that they did not have notice prior to July 2010. While we do not recite that evidence here, we have thoroughly reviewed the evidence with respect to the plaintiffs' notice of the agreements in question, including the evidence relied upon by the parties and that was referenced in the February 2019 order following trial.

Although not stated explicitly, the district court's determination that the plaintiffs did not have notice of the 1994 and 2002 agreements prior to July 2010 was a determination that the discovery rule applied to toll the SOL. The February 2019 order following trial addressed the notice issue at length, and to the extent the evidence presented by Kurt conflicted with that presented by the plaintiffs, the court clearly rejected Kurt's interpretation of the evidence. We find that the court was not clearly wrong in its determination with respect to the running of the SOL. This assignment of error fails.

(c) Relation Back

Kurt assigns that the district court erred in determining that the allegations of the amended complaint related back to the date of the original filing. Essentially, Kurt argues that the plaintiffs' amended complaint filed in August 2014 was time barred, even if the plaintiffs did not discover the defendants' alleged harm until July 2010, because the amended complaint did not relate back to the date of the original complaint filed in November 2013.

Under certain situations as set forth in Neb. Rev. Stat. § 25-201.02 (Reissue 2016), an amended complaint may relate back to the commencement date of an earlier complaint. *Correa v. Estate of Hascall*, 288 Neb. 662, 850 N.W.2d 770 (2014). With respect to the amendment of pleadings, § 25-201.02(1) provides that "[a]n amendment of a pleading that does not change the party or the name of the party against whom the claim is asserted relates back to the date of the original pleading if the claim or defense asserted in the amended pleading arose out of the conduct,

transaction, or occurrence set forth or attempted to be set forth in the original pleading." On the other hand, § 25-201.02(2) provides:

> If the amendment changes the party or the name of the party against whom a claim is asserted, the amendment relates back to the date of the original pleading if (a) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, and (b) within the period provided for commencing an action the party against whom the claim is asserted by the amended pleading (i) received notice of the action such that the party will not be prejudiced in maintaining a defense on the merits and (ii) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The Nebraska Supreme Court has interpreted § 25-201.02(2) to apply only to an amendment that "changes the party or the name of the party" and that refers to a substitution, rather than to an addition, of parties. See *Gibbs Cattle Co. v. Bixler*, 285 Neb. 952, 831 N.W.2d 696 (2013). See, also, *Kelly v. Saint Francis Med. Ctr.*, 295 Neb. 650, 889 N.W.2d 613 (2017).

The original complaint was filed on November 7, 2013, by the plaintiffs, individually, and named as defendants Lillian and Kurt, individually and as co-trustees of both Lillian's Trust and the Family Trust. The plaintiffs filed a motion for leave to file an amended complaint on July 21, 2014. In its journal entry granting the plaintiffs' motion, the district court noted that the defendants had no objection to the motion. On August 26, the plaintiffs, individually and derivatively on behalf of Cottonwood Flats, filed their amended complaint against Lillian, individually, as trustee of Lillian's Trust, as trustee of the Family Trust, and as director and officer of Cottonwood Flats, and against Kurt, individually, and as director and officer of Cottonwood Flats.

The plaintiffs argue that their amended complaint falls within § 25-201.02(1) and relates back to the filing date of their original complaint because it did not add new parties as defendants. In other words, Kurt and Lillian were still the only two named defendants; the amended complaint just changed the titles of the defendants in their fiduciary capacities. The plaintiffs also point out that they filed their motion for leave to amend on July 21, 2014, within 4 years of when they had notice of the 1994 and 2002 agreements. We agree.

We do not view the change with respect to the titles of the defendants in their fiduciary capacities in the amended complaint to be a change to the name of a party against whom a claim is asserted, and the claims asserted in the amended complaint clearly arose out of the conduct, transactions, or occurrences asserted in the original complaint. Kurt does not, in fact, assert otherwise. His arguments in support of this assignment of error rely on his arguments with respect to Cottonwood Flats being an indispensable party and the plaintiffs' notice of the 1994 and 2002 agreements for SOL purposes, which arguments we have rejected above. The district court did not abuse its discretion in granting the plaintiffs' motion to file an amended complaint. This assignment of error fails.

(d) Adoption of Proposed Order

Kurt assigns that the district court erred in adopting the plaintiffs' proposed order verbatim following trial. He also assigns that the court erred in entering judgment against Lillian's Trust in the February 2019 order following trial.

A trial court in a case tried to the court without a jury may adopt a party's proposed findings of fact verbatim provided that the findings and conclusions reflect the court's independent view and judgment of the evidence. *The Wayne L. Ryan Revocable Trust v. Ryan*, 308 Neb. 851, 957 N.W.2d 481 (2021). Although findings drawn by the trial court itself are more helpful to the appellate court, findings prepared by counsel and adopted verbatim by the trial judge are formally the judge's and will stand if supported by evidence. *Id.* The adoption of a party's proposed findings does not require an appellate court to set aside the deference ordinarily given to the trial judge's factual findings. *Id.* When accepting a party's proposed findings, minor mistakes that do not prejudice a party constitute harmless error; however, a trial court may commit error if the proposed facts or law are unsupported by the evidence and cause prejudice. *Id.* The critical inquiry is whether such findings, as adopted by the court, are clearly erroneous. *Id.*

In the *Wayne L.* case, the Nebraska Supreme Court stated:

In one of the leading state court cases on this issue . . . the Supreme Court of Colorado held that when a trial judge signs findings prepared by counsel for the prevailing party, the correctness of the findings becomes the judge's responsibility, and the appellate court will presume that the trial judge examined the proposed findings and agreed that they correctly stated the facts as the judge found them to be. Moreover, independent of any presumption, appellate courts have remarked that when a trial court makes changes to the proposed findings, that is an indication the trial court considered the findings before adopting them and read, analyzed, and agreed with the findings that were left unchanged.

*Wayne L. Ryan Revocable Trust v. Ryan, supra*, 308 Neb. at 875, 957 N.W.2d at 499, citing *Uptime Corp. v. Colorado Research Corp.*, 161 Colo. 87, 420 P.2d 232 (1966).

Here, trial was held on April 17-21, 2017. Following a February 8, 2019, hearing on a motion for sanctions filed by Kurt, the district court advised the parties to submit proposed final orders by February 22, 2019. Kurt observes that the court's February 2019 order following trial was entered on February 28, only 6 days after that deadline. He argues that "the clear errors embedded in the proposed order [the trial court] adopted verbatim" show that the order "was not the independent, reasoned decision of a court weighing the evidence" and denied him due process. Brief for appellant at 38-39. He argues further that the court's only original additions to the proposed order it adopted were the addition of the title, "FINAL ORDER FOLLOWING TRIAL," and the addition of a final sentence overruling Kurt's motion for sanctions. He states that the court's "entry of a money judgment against Lillian's Trust, who was never a party to this action, raises serious doubts that the trial court carefully reviewed the order before signing it and entering it as its own order." Brief for appellant at 38. This assertion presumably refers to paragraph D of the relief granted portion of the February 2019 order following trial, which was eliminated in the May 2019 order granting the plaintiffs' motion to alter or amend.

Unlike the Colorado Supreme Court, which did not have the benefit of transcribed trial proceedings when reviewing the *Uptime Corp.* case, we have been provided with an extensive record, including transcriptions of the trial testimony and many of the numerous post-trial proceedings, as well as a multitude of exhibits, pleadings, and court orders. Despite Kurt's assertion that the February 2019 order following trial is embedded with clear errors and does not reflect the trial judge's independent view and judgment of the evidence, he does not identify which of the findings of fact and conclusions of law in the court's 55-page order are unsupported by the record. In order to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement to specifically assign and specifically argue the alleged error. *Id.* We decline to consider these assigned errors further.

(e) Due Process

Kurt assigns that "[t]he successor court erred when it finalized the trial court's incomplete order because it made findings of fact and law based on insufficient evidence and inconsistently applied procedural rules during hearings, made rulings on matters such as attorney fees and accounting of expenses and transactions where testimony was heard only by the trial court which denied due process to Defendant." Brief for appellant at 13.

Kurt's assigned error does little to advise this court of the issue submitted for decision. Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement to specifically assign and specifically argue the alleged error. *Dycus v. Dycus, supra.* A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered except to the extent that it is narrowed by the specific arguments asserted in the appellant's brief. *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012).

Kurt cites *Liljestrand v. Dell Enters.*, 287 Neb. 242, 842 N.W.2d 575 (2014), wherein the Nebraska Supreme Court observed that generally, a successor judge may not make a decision based on conflicting evidence that a predecessor judge heard. The plaintiffs argue that Kurt waived any due process arguments with respect to proceedings heard by the interim or successor judges following the retirement of the trial judge by the filing of his motion to alter or amend on May 31, 2019, after the trial judge's retirement on May 30, which asked the interim judge to rule on the prior evidentiary record. See *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018) (party has due process right that successor or substitute judge may not render judgment for predecessor judge who conducted trial, but party may waive this right and agree to have successor judge decide case). The post-trial record is replete with Kurt's objections to the interim or successor judge making any decisions based on conflicting evidence heard by the trial judge. However, we do not see any violation of Kurt's due process rights.

Kurt's vague assignment of error is narrowed somewhat in his brief to focus on the attorney fee ruling in the May 2020 order on attorney fees. An evidentiary hearing on the amount of attorney fees was held on February 19, 2020. The successor judge received new evidence as to the amount of attorney fees and in entering the May 2020 order on attorney fees was not required to make

decisions based on the evidence heard by the trial judge. Evidence received at the hearing included exhibits outlining the attorney fees and costs incurred by the plaintiffs and testimony from a licensed Nebraska attorney familiar with cases similar to the present case, who testified based on his review of the pleadings, exhibits received at the hearing, and relevant rules and case law that the fees requested by the plaintiffs were fair and reasonable for a case of this complexity and type in this area of the country. Based on the evidence received at the hearing, the court awarded attorney fees and costs totaling $413,059.04. Kurt's due process rights were not violated with respect to the attorney fee hearing. Nor was it violated by the successor judge hearing new evidence with respect to the post-trial accounting. This assignment of error fails.

## 2. EVIDENTIARY ERRORS

### (a) Offer of Documents

Kurt asserts that the district court erred in allowing the plaintiffs to offer evidence of documents not pled in the amended complaint and which they failed to timely supplement in violation of the court's progression order. More specifically, he argues that the court erred in considering evidence of his employment agreements with Cottonwood Flats and that he had no notice that any claim about salary would be an issue at trial.

At trial, Kurt was asked if he recalled testifying in his pretrial deposition that in 2002, he and Lillian decided that Cottonwood Flats would start paying him a salary for the work he performed for Cottonwood Flats. Kurt objected on the basis of relevance, arguing that the amended complaint "includes no allegation regarding employment, salaries, et cetera." He also referenced discovery responses filed by the plaintiffs, "where they made additional allegations of breach of fiduciary duty on the basis of two people in a corporation employing another one that was a member of the corporation, but those are not part of the amended complaint." He again objected on the basis of relevance. Kurt made similar objections to the offer of the actual employment agreements and two of the related promissory notes. The court overruled Kurt's objections and received these exhibits and testimony about them into evidence.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016). In their amended complaint, the plaintiffs alleged that the defendants breached their fiduciary duties in various ways including due to their conflict of interest with respect to Cottonwood Flats' authorization and execution of "other transactions concerning the valuation of assets or stock of the Corporation for less than fair value or the transfer of such stock or assets to [Kurt] for less than fair value." The employment agreements were relevant to this claim, the request for corporate accounting, and other allegations with respect to self-dealing set forth in the amended complaint. As to Kurt's claim of lack of notice that his salary would be an issue at trial, he was questioned about the employment agreements in the September 2015 pretrial deposition. The employment agreements were also listed in the parties' joint exhibit list filed with the district court on April 14, 2017. The court did not abuse its discretion in admitting this evidence.

(b) Purchase of Sarah's Stock

Kurt assigns, "The court erred in permitting testimony regarding Kurt's purchase of Sarah's stock which was never pled, involved no duty owed to Plaintiffs or any party, and about which Plaintiffs had notice more than four years before they first asserted the claim in their proposed order." Brief for appellant at 43. We have not considered this error, which was not specifically assigned and specifically argued. See *Bohling v. Tecumseh Poultry*, 314 Neb. 129, 988 N.W.2d 529 (2023) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). Kurt does not present any arguments about the actual admission of testimony with respect to the purchase of Sarah's stock. His argument in support of this assigned error appears to relate more to: (1) the ruling in the February 2019 order following trial that if the post-trial accounting found assets of Cottonwood Flats were used to pay for the purchase by Kurt of Sarah's stock, Kurt should transfer to Cottonwood Flats "the proportionate share" of Sarah's stock paid for by Cottonwood Flats or (2) the determination in the January 2022 final order that Cottonwood Flats' assets were used to pay for 69.3% of the purchase price of Sarah's stock and that Kurt should accordingly transfer that percentage of the shares (43.4 shares) back to Cottonwood Flats. At the conclusion of his argument, Kurt states that the court erred when it "entered orders on a matter that was not part of the pleadings and which did not constitute a derivative claim of Cottonwood Flats, Inc." Brief for appellant at 44. However, Kurt did not specifically assign error to the court's orders with regard to Sarah's stock. We decline to address this assignment of error further.

### 3. ATTORNEY FEES IN DERIVATIVE ACTION

Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Echo Group v. Tradesmen Internat.*, 312 Neb. 729, 980 N.W.2d 869 (2022). The plaintiffs sought and the district court awarded attorney fees on the bases of both § 30-3893 (award of attorney's fees in proceedings involving administration of trust) and § 21-2076 (award of attorney fees in derivative actions). The court ordered payment of attorney fees, jointly and severally, by Kurt, individually, and by Kurt, as special administrator of Lillian's estate, under both statutes. The total amount of attorney fees and costs awarded to the plaintiffs was $413,059.04; the award of attorney fees and costs was not split between the various claims brought by the plaintiffs. We do not need to determine whether the award of attorney fees was proper under § 30-3893 as Kurt does not challenge the award of attorney fees on that basis. However, he assigns that the court erred in awarding attorney fees in the derivative action against an individual director rather than Cottonwood Flats.

The plaintiffs filed their amended complaint on August 26, 2014, prior to the repeal of § 21-2076 (repealed by 2014 Neb. Laws, LB 749, § 298; 2015 Neb. Laws, L.B. 157, § 10; effective January 1, 2017) and the adoption of the NMBCA. Section 21-2076 provided:

On termination of the derivative proceeding the court may:

(1) Order the corporation to pay the plaintiff's reasonable expenses, including attorney's fees, incurred in the proceeding if the court finds that the proceeding has resulted in a substantial benefit to the corporation.

. . . .

(3) Order a party to pay an opposing party's reasonable expenses, including attorney's fees, incurred because of the filing of a pleading, motion, or other paper, if the court finds that the pleading, motion, or other paper was not well grounded in fact, after reasonable inquiry, or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and was interposed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

See, also, Neb. Rev. Stat. § 21-281 (Reissue 2022) (current provision of NMBCA with substantially similar language).

In the section of the February 2019 order following trial addressing attorney fees under § 21-2076, using language consistent with § 21-2076(1), the district court found that the proceeding had resulted in a substantial benefit to Cottonwood Flats and ordered Kurt individually and as special administrator of Lillian's estate, jointly and severally, to pay the plaintiffs' attorney fees and costs incurred in prosecuting the action. The court did not make any specific findings with respect to § 21-2076(3). In arguing that this portion of the court's award of attorney fees was in error, Kurt cites *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004), where the Nebraska Supreme Court determined that § 21-2076(1) did not authorize a court to order payment of fees by individual defendants. We agree that § 21-2076(1) does not authorize an order for payment of attorney fees by Kurt individually.

The plaintiffs argue that since the district court's award of attorney fees pursuant to § 30-3893 is not implicated by Kurt's assigned errors, he "cannot show any prejudicial error and any decision by this Court regarding derivative fees would have no bearing on the outcome." Brief for appellees plaintiffs at 30-31. They also point out that, with respect to derivative actions, § 21-2076(3) allows a court to order a party to pay an opposing party's reasonable expenses, including attorney fees. The plaintiffs argue that although the court did not make specific findings under subsection (3), its findings with respect to Kurt's credibility at trial provide grounds for such a determination. We are not convinced that the court's credibility findings can be used to support such a conclusion. The Nebraska Supreme Court has observed that § 21-2076 (3) is directed at the conduct of litigation, not at the underlying wrongful conduct of the defendants. *Trieweiler v. Sears, supra*. While the district court in this case made extensive findings about Kurt's credibility, none of those findings address Kurt's actions in the conduct of the present litigation. Additionally, a review of the attorney fee affidavit exhibits admitted in the post-trial proceedings shows that the amount requested by the plaintiffs was for work performed by their attorneys on the case as a whole, and not just on the portions of the case relating to the administration of the Family Trust.

While the district court did not abuse its discretion in awarding attorney fees under § 30-3892, the amount of attorney fees awarded was clearly for work above and beyond that attributable to just the trust matters. The court did abuse its discretion in awarding attorney fees against Kurt pursuant to § 21-2076(1), which does not allow for an award of attorney fees against an individual. We remand for the court to make the appropriate findings, based on the evidence submitted in the post-trial attorney fee hearing, under either § 21-2076(1) or (3), if the court determines that an award is proper under one of those subsections. If the evidence does not support an award under any subsection of § 21-2076, the court may take additional evidence only for the

purpose of determining how much of the claimed attorney fees represented by the exhibits admitted in the previous attorney fee hearing are attributable to the trust administration claims.

Finally, we note that the balance of Kurt's argument in support of this assignment of error relates to matters other than those assigned, and we do not consider that portion of his argument. See *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

### 4. SUBSTANTIVE ERRORS

### (a) Judgment Against Kurt After Accounting

Kurt asserts that the district court erred in entering judgment against him for certain expenses and in using the wrong standard in determining whether the expenses were properly included in a judgment against an individual director. His arguments appear to relate to the amount awarded in the January 2022 final order corresponding to the directions found in paragraph (J)(iii) of the February 2019 order following trial. He argues that in the hearing on the corporate accounting, the successor court did not consider whether the expenses designated by the accountant as "self-interested to Kurt" were "'conflicted interest transactions'" as defined by Neb. Rev. Stat. § 21-2,120 (Reissue 2022). Brief for appellant at 47.

In the February 2019 order, the district court specified in paragraph (J)(iii) that monetary judgment against the defendants following the post-trial accounting was to include the amount of any disbursements or payments made by Cottonwood Flats to Kurt or any third-party on his behalf "which were not approved either by unanimous consent of the shareholders or a majority of shareholders at a meeting called pursuant to Nebraska law following notice to all shareholders." The firm that conducted the post-trial accounting determined that such disbursements totaled $68,862.87. In the January 2022 final order, the successor court, entered judgment against "[Kurt], personally, in favor of Cottonwood Flats" of $68,862.87 for such unapproved "other disbursements or payments" made by Cottonwood Flats on to Kurt or any third party on his behalf during the relevant period.

During the accounting evidentiary hearing, the accountant testified about how his firm identified "items that were not associated with the business of the corporation." He testified that because it can be "fairly difficult" to evaluate whether a certain expenditure was "in furtherance of corporate business," their approach was to identify transactions that were either payments to Kurt or appeared to be for his benefit. He testified further that the portion of the accounting report addressing paragraph (J)(iii) of the February 2019 order represented items that appeared to be directly paid to Kurt or for his benefit or where evidence in the underlying data indicated that it was "not a corporate-purpose type of transaction." He indicated that that portion of the report "basically deals with either items that were paid to Kurt or were evidently for his benefit," in other words, it did include payments that the accounting firm was unable to determine as being for a corporate purpose.

In arguing that the successor court used the wrong standard in determining the award under paragraph (J)(iii), Kurt notes *Glad Tidings v. Nebraska Dist. Council*, 273 Neb. 960, 734 N.W.2d 731 (2007), a case decided prior to Nebraska's enactment of the NMBCA, wherein the Nebraska Supreme Court looked to comments to the MBCA in determining the meaning of the term "transaction" under the provision of the Nebraska Nonprofit Corporation Act (NNCA) governing director conflict-of-interest transactions. In *Glad Tidings*, the Supreme Court determined that the

term "transaction" under the provision of the NNCA at issue in that case generally connotes negotiations or a consensual bilateral arrangement between the corporation and another party or parties that concern their respective and differing economic rights or interests—not simply a unilateral action by the corporation, but, rather, a "deal." See Neb. Rev. Stat. § 21-1987 (Reissue 2022). Kurt appears to argue that the successor court should have applied this definition in making the award pursuant to paragraph (J)(iii) rather than the standard set forth in the February 2019 order following trial (disbursements "which were not approved either by unanimous consent of the shareholders or a majority of shareholders at a meeting called pursuant to Nebraska law following notice to all shareholders"). The NMBCA had not yet been adopted in Nebraska when this case was initiated, and we find that the district court applied the correct statutory provisions in evaluating whether the defendants in this case engaged in conflicting interest transactions.

At the time this case was initiated, "[c]onflicting interest with respect to a corporation" and "[d]irector's conflicting interest transaction[s]" were defined in Neb. Rev. Stat. § 21-20,112 (Reissue 2012) (repealed by 2014 Neb. Laws, LB 749, § 298; Laws 2015, LB 157 § 10, effective Jan. 1, 2017). See, also, § 21-2,120(1) (current provision of NMBCA defining "[d]irector's conflicting interest transaction[s]"). In the February 2019 order following trial, the district court stated, consistent with the definitions in § 21-20,112, that a conflicting interest exists when either a director or a related person is a party to a transaction with the corporation or has a significant financial interest in the transaction such that it would be expected to influence the director's judgment regarding the transaction. The court also observed that director's conflicting interest transactions are only allowed if the director can show their actions were fair to the corporation or were approved by the required number of disinterested directors or shareholders, and that neither exception was shown in this case. See Neb. Rev. Stat. §§ 21-20,113 through 21-20,115 (Reissue 2012) (prohibiting judicial action with respect to conflicting interest transactions if approved by vote of qualified directors or qualified shareholders or if transaction is fair to corporation), since repealed by 2014 Neb. Laws, LB 749, § 298; Laws 2015, LB 157 § 10 (effective Jan. 1, 2017). See, also, Neb. Rev. Stat. §§ 21-2,121, 21-217, 21-2,122, and 21-2,123 (Reissue 2022) (current corresponding provisions of NMBCA). The trial court examined the 1994, 2002, and 2010 agreements and the 2010 Transaction, determined that these agreements and the transaction were all conflicting interest transactions, determined that the defendants did not obtain qualified directors' or qualified shareholders' approval for these transactions, and that they were not fair to the corporation.

Kurt does not directly challenge the district court's finding in the February 2019 order following trial that the defendants engaged in conflicted interest transactions. Instead, he argues that the successor court's award under paragraph (J)(iii) included expenses that "were not transactions." Brief for appellant at 48. He also argues that the court did not consider whether a particular expense included in the accountant's report (a condo investment of $35,000) was made in good faith. In support, he cites *McGill v. Lion Place Condo. Assn.*, 291 Neb. 70, 864 N.W.2d 642 (2015) (according to business judgment rule, courts are precluded from conducting inquiry into actions of corporate directors taken in good faith and in exercise of honest judgment in lawful and legitimate furtherance of corporate purposes). Finally, citing Neb. Rev. Stat. § 21-2,106 (Cum. Supp. 2014) (effective January 1, 2016) (NMBCA provision concerning functions of officers), he argues that the duty to approve and monitor corporate expenses falls on the officers of a corporation

as determined by the bylaws, arguing further that the court's order effectively transfers authority for managing the day-to-day operation of the business to the shareholders.

Kurt's arguments ignore the relevant statutory provisions concerning director's conflicting interest transactions, and the authority he cites is not directly on point. We find that the trial court applied the correct statutory authority in determining whether the defendants engaged in conflicting interest transactions. In determining the amounts attributable to such transactions pursuant to paragraph (J)(iii) of the February 2019 order following trial, the successor court evaluated the credibility of the evidence presented at the accounting evidentiary hearing and accepted the version of the facts presented by the plaintiffs. We give weight to its determination in that regard and find no error in the amount awarded under paragraph (J)(iii), which is supported by the record. See *Strohmyer v. Papillion Family Medicine*, 296 Neb. 884, 896 N.W.2d 612 (2017). This assignment of error fails.

(b) 1976 Stock Certificates

Kurt asserts that the district court erred in concluding that the 1976 stock certificates constituted constructive gifts to the plaintiffs. Brief for appellant at 49. He argues that the plaintiffs' 1976 stock certificates were never delivered, based in part on his testimony that Lillian found the plaintiffs' 1976 original stock certificates in a briefcase sometime after William's death. Kurt did not challenge the plaintiffs' ownership of these shares of Cottonwood Flats stock until after this lawsuit was filed.

To make a valid inter vivos gift, there must be an intention to transfer title to property, delivery by the donor, and acceptance by the donee. *In re Estate of Marsh*, 307 Neb. 893, 951 N.W.2d 486 (2020). Ordinarily, actual delivery is necessary where the subject of the gift is capable of manual delivery, but where actual manual delivery cannot be made, the donor may do that which, under the circumstances, will in reason be considered equivalent to actual delivery. *Id.* The exercise by the donee of dominion over the property which is the subject of a gift, or an assertion of a right to the property by the donee, generally will constitute an acceptance. *Id.* Whether a deed or other instrument conveying an interest in property has been delivered is largely a question of intent to be determined by the facts and circumstances of the particular case. *Id.*

In the February 2019 order following trial, the district court recited evidence with respect to stock ownership and gifting. Then in the analysis portion of the order, the court addressed and rejected Kurt's assertion that the plaintiffs did not receive delivery of the 1976 stock gifted to them. The court stated that the evidence presented at trial was sufficient for it to find that William intended to and did make the 1976 gifts of 21.6 shares of stock to each of his children. Thus, the court concluded that each of the plaintiffs owned 62.6 shares of stock in Cottonwood Flats (gifts of 21.6 shares each in 1976, 12 shares each in 1980, and 14.5 shares each in 1994 and again in 1995) prior to any relief granted.

We have reviewed the evidence regarding the 1976 stock gifts (including, among other things, the summary of valuation of stock gifts in 1994/1995, the shareholders' list for annual meeting dated November 7, 2009, and the 2010 annual report). Under the facts and circumstances of this particular case, we find no error in the district court's determinations that William intended to and did gift each of his children 21.6 shares of stock in 1976 and that the plaintiffs each owned

62.6 shares of stock in Cottonwood Flats prior to any relief granted by the court. This assignment of error fails.

(c) Findings With Respect to Lillian

Kurt on appeal, and the Family Trust on cross-appeal, have assigned error with respect to the district court's findings as to Lillian, and we address those assigned errors and arguments together. Generally, they assert that the district court erred in finding that Lillian breached her fiduciary duties as successor trustee of the Family Trust, that she was subject to undue influence by Kurt, and that the 2010 Transaction and related documents resulted from that undue influence.

*(i) Breach of Fiduciary Duty as Trustee of Family Trust*

A trust creates a fiduciary relationship in which one person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another. *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021). The NUTC states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. *Id.* All actions of the trustee must be in the interest of the beneficiaries and no one else. *Id.* A violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach. *Rafert v. Meyer*, 290 Neb. 219, 859 N.W.2d 332 (2015).

In the February 2019 order following trial, the district court addressed the valuation of Cottonwood Flats, noting that its fair market value as of November 2, 2010, was a key issue, given that if Kurt's purchase of the stock was at or above fair market value, the plaintiffs as beneficiaries of the Family Trust may not have suffered any damage. The court concluded that the parties to the 1994 Agreement intended the company to be valued at a reasonable approximation of market value and increased or decreased each year to the extent market values changed. The court noted the experts who testified on the issue of valuation and found that the testimonies of Timothy Kuchata (valuation of real property owned by Cottonwood Flats) and Benjamin Miller (valuation of Cottonwood Flats' stock) was credible and established a reasonable fair market value for the real property and stock.

The district court also noted the combined appraised value of the house and farmland as of November 1, 2010, of $4,665,000, and the increase in the value of the real estate owned by Cottonwood Flats as of January 3, 2013, to $9,275,000 (as shown on the balance sheet prepared by Farm Credit). The court found that, due to that "substantial increase," a money judgment against Kurt and Lillian for the difference between what Kurt "'paid'" for the stock versus the fair market value of the stock, determined as of November 1, 2010, would not provide a sufficient remedy to the plaintiffs and would provide a windfall to Kurt.

Then in the section of the February 2019 order concerning breach of fiduciary duties to the Family Trust, the district court found that Lillian breached her fiduciary duties as the trustee by (1) failing to inform plaintiffs of the establishment of the Family Trust upon William's death and funding of the trust with Cottonwood Flats stock; (2) failing to provide plaintiffs with a copy of the Trust and any reports or accounting of the Family Trust's administration; (4) failing to inform plaintiffs of the 2002 Agreement and 2010 Transaction involving assets of the Family Trust; (5)

distributing assets of the Family Trust (Cottonwood Flats stock) to Kurt absent necessity to provide for his health, education, support, and maintenance as required by the terms of the Family Trust; (6) prematurely distributing Kurt's ⅕ remainder interest in the Family Trust to him prior to Lillian's death; (7) selling assets of the Family Trust (Cottonwood Flats stock) for significantly less than fair market value and failing to inform plaintiffs of the sale; (8) failing to administer the Family Trust in good faith, in accordance with its terms and purposes and solely for the benefit of the beneficiaries; and (9) failing to keep plaintiffs reasonably informed about the administration of the trust and the material facts necessary for them to protect their interests. The court found that plaintiffs were damaged by Lillian's breach of fiduciary duties because the Family Trust's stock in Cottonwood Flats was transferred to Kurt for less than fair market value, significantly reducing the value of the assets held by the trust and available for distribution to beneficiaries, including plaintiffs. The court found Lillian had a conflict of interest in the transaction pursuant to Neb. Rev. Stat. § 30-3867(b) (Reissue 2016), making the transaction voidable by plaintiffs.

The district court again referenced the substantial increase in value as of January 2013 of the farmland owned by Cottonwood Flats and its determination that a monetary judgment for the difference between what Kurt paid and its fair market value in November 2010 would not provide a sufficient remedy. Accordingly, the court found that the 296 shares of stock purchased from the Family Trust should be restored to the Family Trust, placing Kurt, the trust, and the trust beneficiaries in the position they would have been in "had the improper actions never been taken."

The defendants do not present arguments addressing each of the district court's findings with respect to Lillian's breach of fiduciary duty as trustee of the Family Trust, and many of their arguments focus on the issue of the plaintiffs' notice of the 1994 and 2002 agreements, an issue we have already addressed above. We have reviewed the evidence and agree that it shows Lillian breached her fiduciary duties as trustee in multiple ways. To the extent the credible evidence was conflicting on the issue of Lillian's breach of her fiduciary duties as trustee, we consider and give weight to the fact that the district court heard and observed the witnesses and accepted one version of the facts rather than another. The defendants' assignments of error with respect to this issue fail.

*(ii) Undue Influence*

In the amended complaint, the plaintiffs alleged that Lillian was subjected to undue influence from Kurt, and that Kurt had the opportunity to and did exercise undue influence over Lillian for an improper purpose in the agreements and transactions identified in the complaint and in any other transactions concerning the valuation of assets or stock of Cottonwood Flats, William's Trust, or the Family Trust for less than fair value or the transfer of such stock or assets to Kurt for less than fair value. The plaintiffs also alleged that these agreements and transactions clearly resulted from Kurt's undue influence over Lillian.

In the February 2019 order following trial, the district court reviewed the evidence with respect to Kurt's undue influence over Lillian, including evidence that the employment agreements for Kurt were likely not created the dates on which they were purportedly signed and other evidence of Lillian signing false and misleading documents prepared by Kurt without regard to the truthfulness of those documents or Lillian's fiduciary duties, the circumvention of William and Lillian's estate plan by the exertion of Kurt's undue influence, and the lack of effort by Lillian to seek or receive independent counsel regarding the actions Kurt wanted her to take.

The district court stated:

> The sum of the evidence received at trial has convinced the Court that, following William's death, Kurt influenced Lillian to sign any document Kurt asked her to in order to enact Kurt's plan to obtain stock in Cottonwood Flats for less than fair compensation, without regard to Lillian's own fiduciary duties to Cottonwood Flats or the Family Trust. The testimony of Lillian's friends and her children at trial indicate Lillian was viewed as an honest person with good moral character. For Lillian to have signed false documents and violated her fiduciary duties as she did on multiple occasions, it is reasonable to infer that her actions were being controlled by Kurt for his own personal benefit.

The court also noted Lillian's deeding of her home to Cottonwood Flats, without payment, on the same day Kurt became its majority shareholder. The court noted that the purchase price for the stock specifically excluded the value of Lillian's home and that Kurt acknowledged during his testimony the need to pay additional funds to account for the home transfer. The court found this action by Lillian to be "further evidence she was willing to sign documents provided by Kurt without independent analysis." Finally, the court concluded that the evidence showed Lillian "was not acting of her own volition but was merely serving as a conduit for Kurt." The court found that the plaintiffs had met their burden to show that Kurt had the ability/opportunity to exert undue influence over Lillian, that she was susceptible to and subjected to undue influence by him, and that he did exert undue influence over her. The court further found that the November 2010 Transaction and "all of the related documents" were the result of that undue influence.

To establish undue influence, the party asserting that theory has the burden to prove (1) that the person who executed the challenged instrument was subject to undue influence, (2) that there was an opportunity to exercise undue influence, (3) that there was an intent to exercise undue influence for an improper purpose, and (4) that the result was clearly a product of the undue influence. *Pruss v. Pruss*, 245 Neb. 521, 514 N.W.2d 335 (1994). The burden to prove undue influence is clear and convincing evidence when the case is an equitable action, not a probate action. *Id.* It is not merely the exercise of influence which invalidates the action; rather, it is the exercise of undue influence. *Id.* There must be a solid factual foundation on which to rest the inference of the existence of undue influence. *Id.*

The defendants argue that the district court erred in its findings as to undue influence. Kurt relies primarily on certain actions Lillian took after the filing of this lawsuit. The Family Trust points to certain conflicting evidence in the record. Because the evidence was conflicting, we give deference to the court's acceptance of the version of facts presented by the plaintiffs. We have reviewed the evidence and agree it shows Lillian was subject to undue influence, that Kurt had the opportunity to and did exercise undue influence over Lillian for an improper purpose, and that the 2010 Transaction and related documents resulted from that undue influence. The court did not err in its findings with respect to undue influence. The defendants' assignments of error as to the court's undue influence findings fail.

### (d) Findings With Respect to Kurt

Kurt asserts that the district court erred in making certain findings regarding his work for Cottonwood Flats. Specifically, he assigns, "Considered in total the work of Kurt from 1981-2020

provided substantial benefit to the corporation[;] the evidence shows that 2010 transaction both as to method and overall cost when measured against the value added to the corporation by his efforts was fair to the corporation and the court erred in finding otherwise." Brief for appellant at 13. This rather convoluted assignment of error appears to relate to the court's findings of breach of fiduciary duty by Kurt in the corporate derivative action.

An officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and is treated by the courts as a trustee. *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004). An officer or director must comply with the applicable fiduciary duties in his or her dealings with the corporation and its shareholders. *Id.* A violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach. *Id.*

At the time this case was initiated, § 21-20,113 provided that where a director has a conflicting interest in a corporation's transactions, it may be enjoined or give rise to a damages award unless (a) the director has properly obtained board approval pursuant to § 21-20,114, (b) the director has obtained shareholder approval pursuant to § 21-20,115, or (c) the "transaction, judged according to the circumstances at the time of commitment, is established to have been fair to the corporation." See, also, § 21-2,121 (current corresponding provisions of NMBCA). Where a self-dealing transaction is disclosed to the corporation, but the decision on it is made by self-interested directors, the burden is on those who benefit from the venture to prove that the decision was fair to the corporation. See *Trieweiler v. Sears, supra.*

In the February 2019 order following trial, the district court found that Kurt breached his fiduciary duty as an officer and director in various ways, including entering into the employment agreements and related promissory notes. The court went on to discuss the defendants' engagement in self-dealing transactions, the lack of approval by qualified directors and shareholders for those transactions, and it determined that the self-dealing transactions were not fair to the corporation.

Kurt's arguments on appeal focus on the district court's findings with respect to whether the defendants' self-dealing transactions were fair to Cottonwood Flats, specifically its findings with respect to his employment agreements. In that regard the court found that the defendants failed to offer evidence at trial that Kurt's employment agreements and the related promissory notes were fair to Cottonwood Flats, noting there was no evidence indicating the basis for the salary, whether the amount of salary provided to Kurt was reasonable within the community, or whether it was appropriate for the type of work he allegedly performed. Kurt points to evidence admitted at the post-trial accounting evidentiary hearing, arguing this evidence shows that "the value Kurt added to Cottonwood Flats . . . made the salary promised or paid more than a fair bargain." Brief for appellant at 53. He argues further that any fair assessment of the financial condition of the corporation during the period when he managed the farm would demonstrate that "the salary deferred and paid was fair to the corporation." Brief for appellant at 56. He argues that in declaring the employment agreements and promissory notes null and void, the court effectively gave the corporation salary-free management for 20 years, denying him any value for his labor, and ordering a windfall for the corporation. Kurt concludes by arguing that the court erred when it ordered repayment of all salary and employment taxes, "ignoring how the labor and efforts of Kurt have improved the financial condition and cash[ ]flow capacity of Cottonwood Flats." *Id.*

The purpose of the post-trial accounting evidentiary hearing was not to retry the issue of whether any of the defendants' self-dealing transactions were fair to Cottonwood Flats. Rather, the purpose of that hearing was "to award monetary judgment against Defendants for any amounts found due and owing by Defendants to Cottonwood Flats," including "the amount of any salary or other compensation payments made by Cottonwood Flats to Kurt . . . or any third-party on his behalf" from January 2002 to the date of the February 2019 order. Kurt's reliance on evidence submitted at the accounting evidentiary hearing is irrelevant. Kurt does not direct us to any evidence submitted at trial or otherwise argue that he met his burden at trial to show that the employment agreements and related promissory notes were fair to the corporation. In our review of the record, we conclude that the court did not err in its findings with respect to the fairness of these transactions. This assignment of error fails.

## VI. CONCLUSION

We affirm the orders of the district court in all respects with the exception of the award of attorney fees. To the extent the award included fees resulting from the plaintiffs' derivative claims, it was error to award fees against Kurt individually. We reverse the May 19, 2020, order awarding attorney fees to the extent the award included fees arising from the derivative action, and we remand the cause to the district court with directions as set forth above.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

WELCH, Judge, concurring in part, and in part dissenting.

I respectfully concur in part and in part dissent, in part, from the majority's opinion over a jurisdictional concern. The case is primarily styled as a claim by three of the five beneficiaries against the trustees of the Family Trust and Lillian's Trust for breach of fiduciary duty; a derivative claim against members of the board of directors of Cottonwood Flats for breach of fiduciary duty; a claim against Kurt and Lillian for fraud, and a claim against Kurt for undue influence over Lillian in her various roles. The primary assets held by the trusts were shares of stock in Cottonwood Flats, and the thrust of the claims is that Kurt committed fraud and unduly influenced Lillian to enter into agreements in her various roles to have those shares sold to him for less than fair market value while illicitly using the corporation to accomplish his purposes. In connection with these claims, the plaintiffs requested a host of equitable remedies and the court eventually granted many of them including the voiding of certain agreements and undoing certain transactions.

Whereas the Nebraska Model Business Corporation Act contemplates a derivative action on behalf of shareholders to bring a claim against its fiduciaries, the Nebraska Uniform Trust Code does not. In essence, I read the brief for the appellees plaintiffs as arguing that the beneficiaries' three claims against the trusts were in essence derivative claims on behalf of all of the beneficiaries, including Sarah, based upon their aligned interests, although no such procedure is contemplated by statute. Instead, remedies for breach of trust by beneficiaries are found in Neb. Rev. Stat. § 30-3890 et seq. (Reissue 2016) and allows for suits by aggrieved beneficiaries under circumstances described therein. But I find no such statutory right to bring a claim on behalf of an absent beneficiary. Instead, I believe that § 25-323 remains applicable and requires the joining of

Sarah if she is an indispensable party. See *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017) (all persons whose rights will be directly affected by decree in equity must be joined as parties so that complete justice may be done and there may be final determination of rights of all parties interested in subject matter of controversy). Because I do not believe that the court could resolve this dispute as styled without affecting Sarah's rights, I believe she was an indispensable party to the lawsuit. And although the record contains an indication that her heirs chose not to be involved in the lawsuit, subject matter jurisdiction cannot be waived. See *id*. (absence of indispensable party to controversy deprives court of subject matter jurisdiction to determine controversy and cannot be waived). Because the court's decree invalidated the 2002 and 2010 agreements that purported to require all shareholders to sell their shares of Cottonwood Flats to Kurt for less than fair market value, that agreement impacts not only the shares held in the trusts, but also the shares owned individually by Sarah. In short, the nature of the litigation, as styled, indispensably impacted Sarah's rights, and so did the decree, yet she was not named as a party.

For these reasons, I would vacate those portions of the order governing the claims of breach of fiduciary duty or undue influence governing the trust assets and invalidating the agreements but would affirm those portions of the decree governing the derivative claim against the board of directors for the reasons articulated in the majority opinion.